RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0414p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FEDNAV, LIMITED; CANADIAN FOREST NAVIGATION
COMPANY, LIMITED; NICHOLSON TERMINAL AND
DOCK COMPANY; SHIPPING FEDERATION OF
CANADA; AMERICAN GREAT LAKES PORTS
ASSOCIATION; SEAWAY GREAT LAKES TRADE
ASSOCIATION; UNITED STATES GREAT LAKES
SHIPPING ASSOCIATION; BAFFIN INVESTMENTS,
LIMITED; CANFORNAV, INCORPORATED,
                            *Plaintiffs-Appellants*,

      *v.*

STEVEN E. CHESTER, Director of the Michigan
Department of Environmental Quality; MICHAEL
COX, Attorney General for the State of Michigan,
                            *Defendants-Appellees*,

MICHIGAN UNITED CONSERVATION CLUBS;
NATIONAL WILDLIFE FEDERATION; NATURAL
RESOURCES DEFENSE COUNSEL, INCORPORATED;
ALLIANCE FOR THE GREAT LAKES,
                            *Intervenors-Appellees.*

No. 07-2083

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-11116—John Feikens, District Judge.

Argued: September 15, 2008

Decided and Filed: November 21, 2008

Before: GILMAN, KETHLEDGE, and ALARCÓN, Circuit Judges.[*]

_____

[*] The Honorable Arthur L. Alarcón, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1

—————————

**COUNSEL**

**ARGUED:** Norman Chester Ankers, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellants.   Shannon W. Fisk, NATURAL RESOURCES DEFENSE COUNCIL, Chicago, Illinois, Robert P. Reichel, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Norman Chester Ankers, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellants.   Shannon W. Fisk, NATURAL RESOURCES DEFENSE COUNCIL, Chicago, Illinois, Robert P. Reichel, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Neil S. Kagan, NATIONAL WILDLIFE FEDERATION, Ann Arbor, Michigan, Christopher E. Tracy, HOWARD & HOWARD, Kalamazoo, Michigan, for Appellees. Noah D. Hall, LAW OFFICE, Ann Arbor, Michigan, Amy L. Kullenberg, Mashantucket, Connecticut, Robert B. Roche, OFFICE OF THE MINNESOTA ATTORNEY GENERAL, St. Paul, Minnesota, for Amici Curiae.

—————————

**OPINION**

—————————

KETHLEDGE, Circuit Judge.   Plaintiffs—a coalition of shipping companies, non-profit shipping associations, a port terminal and dock operator, and a port association—appeal the district court's dismissal of their constitutional challenges to the so-called Michigan Ballast Water Statute, Mich. Comp. Laws § 324.3112(6), and the regulations promulgated pursuant thereto. We hold that Plaintiffs lack standing to challenge one portion of the statute, and reject their arguments as to its remainder. We therefore affirm.

I.

A.

Congress passed the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, 16 U.S.C. § 4701 *et seq.* ("NANPCA"), to combat the problem of aquatic nuisance species ("ANS") in United States waters. *See* 16 U.S.C. § 4701(b)(1) (1994). ANS are "nonindigenous species that threaten[] the diversity or abundance of native species or the ecological stability of infested waters, or commercial, agricultural, aquacultural or recreational waters dependent on such waters." *Id.* § 4702(1).

In NANPCA, Congress found that "the discharge of untreated water [from] the ballast tanks of vessels . . . results in unintentional introductions of" ANS. *Id.* § 4701(a)(1). Some oceangoing vessels take on ballast water in foreign harbors to maintain trim, draft, and stability of the vessel when not carrying a full load of cargo. Appellants' Br. at 7. This ballast water "may inadvertently contain aquatic organisms, which are then released when the ballast is discharged in another port." *Id.* at 8-9. In most cases, these organisms die, but in some they thrive in their new environment in the absence of natural predators. *Id.* In those cases the organisms "may compete with or prey upon native species of plants, fish, and wildlife, may carry diseases or parasites that affect native species, and may disrupt the aquatic environment and economy of affected near-shore areas." 16 U.S.C. § 4701(a)(2).

One such organism is the zebra mussel, which was introduced into the Great Lakes via discharged ballast water in the 1980s. *Id.* § 4701(3). "In June 1988, this small bivalve mollusk, native to the Black, Azov, and Caspian Seas in [E]astern Europe, was discovered on the Canadian side of Lake Saint Clair in the Great Lakes." 58 Fed. Reg. 18330, 18330 (Apr. 8, 1993). It has since

spread throughout the Great Lakes. Congress estimated in 1990 that "the potential economic disruption to communities affected by the zebra mussel due to its colonization of water pipes, boat hulls and other hard surfaces" could reach $5 billion by the year 2000. 16 U.S.C. § 4701(4). Moreover, "[a]s a filter-feeding organism, [the zebra mussel] removes vast quantities of microscopic organisms from the water, the same organisms that fish larvae and young fish rely upon for their food supply." 58 Fed. Reg. at 18330.

NANPCA's purpose, therefore, was "to prevent unintentional introduction and dispersal of nonindigenous species into waters of the United States through ballast water management and other requirements." *Id.* § 4701(b)(1). To that end, NANPCA required the Coast Guard to "issue regulations to prevent the introduction and spread of aquatic nuisance species into the Great Lakes through the ballast water of vessels." *Id.* § 4711(b)(1).

The Coast Guard issued such regulations on May 10, 1993. The regulations require vessels traveling to the Great Lakes and carrying ballast water from beyond the exclusive economic zone ("EEZ")[1] to employ one of three "ballast water management practices": (1) carry out an exchange of ballast water on the waters beyond the EEZ to achieve a minimum ballast water salinity level of thirty parts per thousand; (2) retain the ballast water onboard the vessel; or (3) use an alternative environmentally sound method of ballast-water management that has been approved by the Coast Guard. 33 C.F.R. § 151.1510(a) (2008).

With respect to the saltwater ballast-exchange method, the Coast Guard explained that

> [c]urrently, the most practical method of helping to protect the Great Lakes from foreign organisms that may exist in discharged ballast water is the exchange of ballast water in the open ocean, beyond the continental shelf. Water in the open ocean contains organisms that are adapted to the physical, chemical, and biological conditions (such as high salinity) of the ocean. These organisms will not, or are unlikely to, survive if introduced into a freshwater system.

58 Fed. Reg. at 18330.

The Coast Guard acknowledged the existence of other possible methods, including "discharging ballast water to reception facilities ashore, heating or chemically treating ballast water, disinfecting ballast water with ultraviolet light, depriving ballast water of oxygen, installing filters, and modifying vessel design." *Id.* But the Coast Guard said there was, at that time, "a lack of research and practical experience on the cost, safety, effectiveness, and environmental impact of these methods." *Id.* The Coast Guard has not approved any alternative ballast-water-treatment methods since 1993.

On October 26, 1996, Congress reauthorized and amended NANPCA by enacting the National Invasive Species Act of 1996 ("NISA"), 16 U.S.C. § 4701 *et seq.* In NISA, Congress noted the continuing problem of ANS and found that "if preventative management measures are not taken nationwide to prevent and control unintentionally introduced nonindigenous aquatic species in a timely manner, further introductions and infestations of species that are as destructive as, or more destructive than, the zebra mussel . . . may occur." 16 U.S.C. § 4701(a)(13). Congress also found that "resolving the problems associated with aquatic nuisance species will require the participation and cooperation of the Federal Government and State governments, and investment in the development of prevention technologies." *Id.* § 4701(15).

---

[1] The EEZ is "the area established by Presidential Proclamation Number 5030 . . . which extends from the base line of the territorial sea of the United States seaward 200 [nautical] miles." 33 C.F.R. § 151.1504.

NISA directed the Coast Guard to implement voluntary national guidelines for ballast-water management in the waters of the United States. If the Coast Guard deemed compliance with the voluntary guidelines inadequate, NISA authorized the Coast Guard to convert the voluntary guidelines into mandatory regulations. 16 U.S.C. § 4711(f). The Coast Guard did precisely that between 1999 and 2004, promulgating mandatory national regulations for ballast-water management. Those national regulations did not change the 1993 Great Lakes-specific regulations, however, except that vessels equipped with ballast tanks entering the Great Lakes are now required to comply with certain recordkeeping and reporting requirements. 33 C.F.R. § 151.2041.

This case ultimately arises from the fact that the Coast Guard's ballast-water regulations contain, for lack of a better term, a loophole. To wit, none of the Coast Guard's ballast-water requirements—neither the 1993 Great-Lakes regulations nor the 2004 national regulations (except for the recordkeeping and reporting requirements)—apply to vessels that declare they have "no ballast on board," so-called "NOBOBs." *See* 33 C.F.R. § 151.1502 (Great Lakes regulations apply to "each vessel that carries ballast water"); 69 Fed. Reg. 44952, 44955 (July 28, 2004) ("our final rule for mandatory [ballast-water management for U.S. waters] does not address NOBOBs"). The Coast Guard explains that NOBOBs are often fully loaded with cargo, and consequently cannot safely conduct a full ballast-water exchange at sea. *See* 70 Fed. Reg. 51831, 51832 (August 31, 2005). Importantly, however, the Coast Guard acknowledges:

> *NOBOBs have the potential to carry [ANS] in their empty tanks via residual ballast water and/or accumulated sediment.* Once NOBOBs enter the Great Lakes, discharge some or all of their cargo and take on ballast water, this water mixes with the residual water and sediment and if this mixed ballast water is subsequently discharged into the Great Lakes, may provide a mechanism for [ANS] to enter the Great Lakes.

*Id.* (emphasis added).

Recognizing this threat, the Coast Guard announced in 2004 that it "is in the process of establishing ballast-water-discharge standards and evaluating shipboard treatment technologies." 69 Fed. Reg. 44952, 44955. The Coast Guard also stated that "[b]allast water discharge standards will be the subject of future rulemaking." *Id.* In the four years since, however, the Coast Guard has not done any further rulemaking regarding ballast-water discharge standards.

What the Coast Guard has done in the meantime—on August 31, 2005—is to issue "best management practices" for NOBOBs. These practices encourage NOBOBs to conduct either a mid-ocean ballast-water exchange or a "saltwater flushing of their empty ballast water tanks" prior to entering the Great Lakes. 70 Fed. Reg. 51831, 51835. Whether NOBOBs adopt these practices, however, is entirely up to them. *Id.*

Thus, to summarize, the Coast Guard's ballast-water regulations applicable to the Great Lakes have remained essentially unchanged since 1993. Vessels entering the Great Lakes carrying ballast water from outside the EEZ must either conduct a mid-ocean ballast-water exchange before discharging ballast water into the Great Lakes, or retain their ballast water. NOBOB vessels are essentially unregulated with respect to their ballast-water practices. They are thus free to take on ballast water in the Great Lakes, mix it with any sediment or residual water in their tanks, and then discharge the mixture into the Great Lakes.

B.

Michigan took action to address the problem of ANS in 2005. Specifically, Michigan amended its Natural Resources and Environmental Protection Act, Mich. Comp. Laws § 324.101 *et seq.*, to require all vessels "engaging in port operations in" Michigan to obtain a permit from the

state.  Mich. Comp. Laws § 324.3112(6) (the "Ballast Water Statute").  The Ballast Water Statute provides:

> Beginning January 1, 2007, all oceangoing vessels engaging in port operations in this state shall obtain a permit from the department. The department shall issue a permit for an oceangoing vessel only if the applicant can demonstrate that the oceangoing vessel will not discharge aquatic nuisance species or if the oceangoing vessel discharges ballast water or other waste or waste effluent, that the operator of the vessel will utilize environmentally sound technology and methods, as determined by the [Michigan Department of Environmental Quality], that can be used to prevent the discharge of aquatic nuisance species.

*Id.*

Pursuant to this provision, the Michigan Department of Environmental Quality ("MDEQ") issued a "Ballast Water Control General Permit" ("General Permit") in 2006.  All oceangoing vessels are required to purchase a General Permit before engaging in port operations in Michigan. To obtain a General Permit, a vessel operator is required to fill out a three-page application and pay a $75 application fee and a $150 annual fee. *Id.* § 324.3120.  The General Permit authorizes the vessel to engage in port operations in Michigan through January 1, 2012, so long as the vessel complies with the requirements of the General Permit.

To comply with the General Permit, all vessels must submit notification reports to the MDEQ at least twenty-four hours prior to engaging in port operations in Michigan.  Each report must include, among other things, the vessel's name, port destination, the date and type of its last ballast-water-management practice (*e.g.,* ballast-water exchange or saltwater flushing), and the total volume or weight of ballast water on board the vessel.

Other reporting requirements depend on whether the vessel will discharge ballast water in Michigan.  Vessels that will not discharge ballast water are required to include in the notification report a "certification that ballast water will not be discharged into the waters of the state."  Vessels that *will* discharge are authorized to do so only if they first treat their ballast water with one of four methods specified in the General Permit.  Those are:  (1) hypochlorite treatment, (2) chlorine dioxide treatment, (3) ultraviolet light radiation treatment preceded by suspended solids removal, or (4) deoxygenation treatment.  The requirements for each treatment method are detailed in the General Permit.

## C.

On March 15, 2007, Plaintiffs sued Steven Chester, director of the MDEQ, and Michael Cox, Attorney General for the state of Michigan, in the United States District Court for the Eastern District of Michigan.  Plaintiffs sought an injunction against enforcement of the Ballast-Water Statute and a declaration that it is unconstitutional.  Specifically, they claimed that the Statute is preempted by federal law and that it violates the Commerce Clause, the Due Process Clause of the Fourteenth Amendment, and various provisions of the Michigan constitution.

Plaintiffs thereafter filed a motion for summary judgment. Defendants opposed the motion, and themselves moved to dismiss the complaint.  Then, by stipulation, the district court added the National Resources Defense Council, Inc., Michigan United Conservation Clubs, Alliance for the Great Lakes, and the National Wildlife Federation as intervening-party defendants in the case.  The intervening defendants joined in the other defendants' positions with respect to the pending motions.

The district court thereafter held oral argument on those motions.  On August 15, 2007, the court denied Plaintiffs' motion for summary judgment, granted Defendants' motion to dismiss the

complaint, and dismissed Plaintiffs' complaint with prejudice.  *See Fednav v. Chester*, 505 F. Supp. 2d 381 (E.D. Mich. 2007).

This appeal followed.[2]

## II.

## A.

We review *de novo* the district court's dismissal of Plaintiffs' complaint for failure to state a claim.  *Lambert v. Hartman*, 517 F.3d 433, 438-39 (2008).

## B.

"We have an obligation to assure ourselves of litigants' standing under Article III." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (internal quotation marks omitted).  That assurance, as shown below, is hard to come by here.

## 1.

Standing has three elements.  "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted).  Second, the injury must be "fairly traceable to the challenged action of the defendant."  *Id.* (internal alterations omitted).  Third, it must be likely that the injury will be "redressed by a favorable decision."  *Id.* at 561.

Each of these elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.*  Here, Plaintiffs' complaint was dismissed at the pleading stage.  In determining each Plaintiff's standing, therefore, "we must accept as true all material allegations of the complaint[.]"  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

Our determination of standing is both plaintiff- and provision-specific.  That one plaintiff has standing to assert a particular claim does not mean that all of them do.  *See Allen v. Wright*, 468 U.S. 737, 752 (1984) ("the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted") (emphasis added); *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 278 (6th Cir. 1997) ("Because we believe that each group of plaintiffs presents different concerns in regard to the doctrine[] of standing . . . we will treat each group separately").  Moreover, that a plaintiff has standing to challenge one of a statute's provisions does not mean the plaintiff has standing to challenge all of them; "[s]tanding is not dispensed in gross."  *Lewis v. Casey*, 518 U.S. 343, 358 (1996).

## 2.

Here, we have multiple plaintiffs.  They include four shipping companies: Fednav, Limited, Canadian Forest Navigation Company, Limited, Baffin Investments, Limited, and Canfornav, Incorporated (the "Shipping Companies").  They include three shipping associations: the Shipping Federation of Canada, the Seaway Great Lakes Trade Association, and the United States Great Lakes Shipping Association (the "Shipping Associations").  They also include a port terminal,

---

[2]Plaintiffs have not appealed the dismissal of their state-law claims.

Nicholson Terminal and Dock Company ("Nicholson"), and a port association, The American Great Lakes Ports Association (the "Ports Association").

Each of these Plaintiffs seeks, in this Court at least, to challenge two distinct provisions of the Michigan Ballast Water Statute. First, they challenge the statute's requirement that all "oceangoing vessels engaging in port operations in" Michigan obtain a permit (the "permit requirement"). Mich. Comp. Laws § 324.3112(6). Second, they challenge the requirement—applicable only to oceangoing vessels that discharge ballast water in Michigan—that they employ a treatment system approved by the MDEQ as a safe and effective means of preventing the discharge of ANS (the "treatment requirement"). *Id.* We must determine, therefore, whether each Plaintiff has standing to challenge each of these requirements.

a.

We first consider each Plaintiff's standing to challenge the permit requirement.

Each of the Shipping Companies alleges that its "[o]ceangoing vessels. . . are required to procure permits from the MDEQ under the Ballast Water Statute and are subject to, and affected by, its regulatory scheme." Compl. ¶¶ 3, 4, 10, 11. Those permits cost money, so each of the Shipping Companies has alleged an injury in fact resulting from the permit requirement. Thus, at this stage of the case at least, each of them has standing to challenge that requirement.

The same is true for the Shipping Associations. These Plaintiffs do not allege that they themselves have purchased, or will purchase, permits pursuant to the Statute. But they do allege that their members must do so. Their standing thus depends on principles of associational standing. An association has standing to assert claims on behalf of its members if (1) the associations' members "would otherwise have standing to sue in their own right"; (2) the interests the association seeks to protect in the case are "germane" to the association's purpose; and (3)"neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Each of the Shipping Associations meets this test. First, each Association has shown that its members would have standing to challenge the permit requirement in their own right because its members own vessels that are required to purchase permits. Second, each has shown that the interests it seeks to protect in this case are germane to its purpose—which for each Association is "to promote the interests of its shipowner and agent members in maritime transportation and international trade." Compl. ¶¶ 6, 8, 9. Third, none of the Associations' claims or their requested relief—an injunction binding the Michigan Defendants, and a declaratory judgment—require the participation of their members in the lawsuit. The Associations do not, for example, seek individualized damages that only a member could obtain. *Hunt,* 432 U.S. at 343. Each of the Shipping Associations therefore has standing to challenge the permit requirement.

But Nicholson and the Ports Association do not. Nicholson alleges that "[o]ceangoing vessels that use or intend to use [its] stevedoring, dock and warehousing services or facilities are required to procure permits from the Michigan Department of Environmental Quality under the Ballast Water Statute and are subject to, and affected by, its regulatory scheme as described above." Compl. ¶ 5. This is an allegation that Nicholson's *customers* are injured by the permit requirement, not that Nicholson itself is. And Nicholson otherwise does not attempt to allege that it has itself suffered an injury in fact as a result of the permit requirement. It therefore lacks standing to challenge the requirement. *Lujan*, 504 U.S. at 560.

Similarly, the Ports Association alleges that "[o]ceangoing vessels intending or wanting to use the facilities" of its members "are required to procure permits from the Michigan Department of Environmental Quality under the Ballast Water Statute and are subject to, and affected by, its

regulatory scheme as described above." Compl. ¶ 7. The Ports Association thus seeks to challenge the permit requirement on the grounds that it has *members* that operate port facilities that in turn have *customers* that are required to purchase permits under the Ballast Water Statute. An allegation so gossamer cannot nearly support the weight that *Lujan* places upon it. Like its members, therefore, the Ports Association lacks standing to challenge the permit requirement.

b.

We next consider each Plaintiff's standing to challenge the treatment requirement. Pursuant to this requirement, *all* oceangoing vessels that discharge ballast water in Michigan—NOBOB or not—must treat their ballast water prior to discharge. *See* Mich. Comp. Laws § 324.3112(6). Treatment systems, like permits, obviously cost money; and it is undisputed here that the systems Michigan requires cost upwards of a half-million dollars per vessel. It should have been easy, then, for a Plaintiff that is actually harmed by this requirement to allege an injury in fact. A Shipping Company could allege, for example, that, because of the treatment requirement, it has spent money to install a treatment system on one of its ships.

But no Plaintiff makes any such allegation in the complaint. The complaint is bereft of *any* allegation that *any* of the Plaintiffs has spent a single dollar, or otherwise been harmed, because of the treatment requirement. Instead, Plaintiffs allege the following:

> The *overwhelming majority* of the oceangoing vessels owned, controlled, operated, represented by or using the services or facilities of plaintiffs and those of the members of the associations who are named plaintiffs (a) *do not discharge ballast water* into waters of the state of Michigan and (b) do not, in particular, discharge ballast waters containing aquatic invasive species.

Compl. ¶ 14 (emphasis added).

This simply does not amount to an allegation of injury in fact. What the paragraph *does* say is that the "overwhelming majority" of Plaintiffs' vessels lack even the *predicate* for being subject to—and thus potentially harmed by—the treatment requirement; namely, that they discharge ballast water in Michigan. Indeed, in an affidavit attached to Plaintiffs' motion for summary judgment, a Fednav "senior officer" makes the point even more strongly:

> *Virtually all* of the oceangoing vessels owned or operated by Fednav and, to the rest of my knowledge, the other plaintiffs[,] *do not discharge any ballast water whatsoever* in Michigan. They come to Michigan to discharge cargo, and consequently to take on cargo.

(Emphasis added).

Thus we know that, not only the overwhelming majority, but "virtually all" of Plaintiffs' ships do not discharge ballast water in Michigan. And to the extent that Plaintiffs do not so discharge, they are not even subject to the treatment requirement, much less harmed by it. Plaintiffs themselves contended in the district court that "[t]he four methods the state outlines for cleansing a vessel's ballast water do not, and cannot, apply to a vessel that does not even discharge ballast water within the Great Lakes." What paragraph 14 of the complaint does say, then, does nothing to advance the cause of any Plaintiff's standing.

But Plaintiffs argue that standing is conferred by what the paragraph does not say. To wit, that because the "overwhelming majority" of their vessels do *not* discharge ballast water in Michigan, there must be a few that do. We reject that argument for at least two reasons. First, the negative implication upon which Plaintiffs now rely—that some of their vessels *do* discharge ballast

water in Michigan—would not, without more, confer standing to challenge the treatment requirement. Merely discharging ballast water in Michigan does not constitute an injury in fact, to a Shipping Company at least. To them, discharge itself is not a harm at all, much less one caused by the treatment requirement. Only *"actual or imminent" compliance* with the requirement could potentially harm any of these Plaintiffs. *Lujan*, 504 U.S. at 560. And none of them have remotely alleged that they have taken *any* action, much less an injurious one, in compliance with the treatment requirement. The complaint is conspicuously silent on that point.

Second, and more fundamentally, we simply will not strain to construe the complaint to say by negative implication what it very simply could have said directly. Were it otherwise, the law of standing would become even more difficult than it already is. We instead hold fast to the "long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *F/W PBS v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal citations and quotation marks omitted).

Plaintiffs also argue, with respect to standing, that the complaint describes the treatment requirement—thus implying that it harms them. The complaint does indeed describe that requirement succinctly. *See* Compl. ¶ 18. But the allegation upon which Plaintiffs rely is a description of the Statute, not their ships. And "the mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient" to confer standing on any Plaintiff. *Magaw*, 132 F.3d at 293. Plaintiffs must instead take the next step, and put themselves on record, by alleging not only that the treatment requirement exists, but also that they are harmed by it. None of them has done that here.

Finally, it is true that each Plaintiffs alleges that it is "subject to, and affected by, [the Ballast Water Statute's] regulatory scheme as described above." Compl. ¶¶ 3-11. For several reasons, however, that allegation does not amount to an allegation of injury in fact caused by the treatment requirement. First, the Statute's "regulatory scheme" includes not only the treatment requirement, but the permit requirement as well. And the Shipping Companies and Associations cannot avoid the rule set forth in *Cuno*—namely, that a plaintiff cannot "by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him"—by referring to regulatory actions in gross. *Cuno*, 547 U.S. 332, 353 n. 5 (2006); *see also Lewis*, 518 U.S. at 358. Second, Plaintiffs' allegation is only that they are affected by the Statute's "regulatory scheme *as described above*"—and what is "described above," by our reading, pertains primarily if not entirely to the permit requirement. *See* Compl. ¶ 2. Third, a mere allegation that a plaintiff is "affected" by governmental action does not amount to an allegation of injury in fact. There are plenty of effects that do not rise to the level of legal harm; and a plaintiff must therefore tell us *what the effect is* in order to allege an injury in fact. *See Sierra Club v. Morton*, 405 U.S. 727, 735 n. 8 (1972) (allegation that plaintiff's "interests would be vitally affected by the acts hereinafter described" did not confer standing absent an allegation as to *how* they were so affected); *compare Magaw*, 132 F.3d at 281 (plaintiffs' allegations that the challenged Act "forc[ed] them to 'stop production,' 'decline work,'" and "'redesign and relabel products'" satisfied element of injury in fact).

The reality is that Plaintiffs' allegations—and thus, their allegations of harm—are directed at the permit requirement, not the treatment one. *See* Compl. ¶ 2 ("The Ballast Water Statute imposes regulations which have the purpose and effect of requiring oceangoing vessels which do not discharge ballast water containing aquatic invasive species to nevertheless procure permits from the Michigan Department of Environmental Quality"); ¶ 18 ("the Ballast Water Statute requires oceangoing vessels to procure a permit *even if* they do not discharge ballast waters") (emphasis in original); ¶ 22 (the statute "require[s] owners and operators of oceangoing vessels to procure permits to operate even if they do not discharge ballast water containing aquatic invasive species"). As one Defendant observes, "[i]n essence, instead of alleging that they are harmed by the Ballast [Water] Statute because they have to use new treatment technology or methods, [Plaintiffs] asserted that they

are harmed precisely because *they do not undertake the action*—discharging ballast into Michigan's waters—that would require them to do so." Supplemental Br. of the Natural Resources Defense Council at 3 (emphasis added).

The only claims over which we have jurisdiction, then, are those of the Shipping Companies and the Shipping Associations (hereinafter, "Plaintiffs") with respect to the permit requirement.

## C.

### 1.

Plaintiffs claim the permit requirement is preempted by federal law. Preemption can be express or implied. Express preemption occurs when Congress "explicitly state[s]" that it intends a statute to have that effect. *Jones v. Roth Packing Co.,* 430 U.S. 519, 525 (1977). Implied preemption comes in two forms, field and conflict preemption. Field preemption occurs when "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Ohio Mfrs. Assoc. v. City of Akron*, 801 F.2d 824, 828 (6th Cir. 1986) (quoting *Hillsborough County, Fla. v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713 (1985)). Field preemption also occurs when an "Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157 (1978). Conflict preemption occurs when a provision of state law "actually conflicts with federal law." *City of Akron*, 801 F.2d at 828.

It is undisputed that there is no express preemption here. Congress did not expressly state in NANPCA or NISA that it intended to preempt state law. Federal law will only preempt the permit requirement, therefore, if Congress has occupied the field in which the permit requirement falls, or if the requirement actually conflicts with federal law. We examine each type of implied preemption in turn.

### a.

Plaintiffs argue that the permit requirement is subject to field preemption. Specifically, they contend that "two pertinent [federal] statutes"—NISA and NANPCA—leave no room for enforcement of the Ballast Water Statute. Appellants' Br. at 38. Before addressing that contention directly, however, we must do two things: first, define the relevant field; and second, determine whether, as the district court held, that field is one in which state regulation is affirmatively preserved by means of NISA's "savings clause."

NISA neatly defines the relevant field in this case. NISA's purpose is "to prevent unintentional introduction and dispersal of nonindigenous species into waters of the United States through ballast water management and other requirements." 16 U.S.C. § 4701(b)(1). Under the structure of the statute, this purpose encompasses two distinct fields: first, the "*prevention*" of ANS introduction into the Great Lakes, which includes measures "to minimize the risk of introduction of aquatic nuisance species," *id.* § 4722(c)(1) (emphasis added); and second, the "*control*" of ANS dispersal after introduction, which includes measures such as "eradication of infestations, reductions of populations, development of means of adapting human activities and public facilities to accommodate infestations, and prevention of the spread of aquatic nuisance species from infested areas." *Id.* § 4722(e)(1) (emphasis added).

The Ballast Water Statute falls in the field of ANS prevention. The Statute seeks to prevent introduction of ANS into Michigan waters; it says nothing about controlling them *after* introduction. *See* Mich. Comp. Laws § 324.3112(6). Hence, this field—the prevention of ANS introduction—is the relevant one for our preemption analysis.

We next consider whether NISA's savings clause preserves state regulation in this field. The clause states: "Nothing in this chapter shall affect the authority of any State or political subdivision thereof to adopt or enforce control measures for aquatic species, or diminish or affect the jurisdiction of any State over species of fish and wildlife." 16 U.S.C. § 4725. The district court held that the clause saved the Ballast Water Statute from preemption, reasoning that "[t]he saving clause alone makes it difficult to comprehend that Congress intended to occupy this entire field[.]" *Fednav*, 505 F. Supp. 2d at 394.

We respectfully disagree. The savings clause concerns a different field than the one at issue here. As Plaintiffs persuasively point out, the clause preserves only state authority to "adopt or enforce *control* measures[.]" 16 U.S.C. § 4725 (emphasis added). The clause is silent as to *prevention* measures. These, as discussed above, are terms of art in NISA. And because the savings clause preserves only state authority to adopt ANS control measures, it is inapposite to the question whether Congress intended to preempt the field of ANS prevention measures.

So we now turn to that question. In doing so, we are guided by the "oft-repeated" principle that Congress' intent is the "ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "In deciding whether a federal law pre-empts a state statute, our task is to ascertain Congress' intent in enacting the federal statute at issue." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983).

Implied preemption being precisely that—implied—Congress's intent to preempt is often divined inferentially, by measuring the comprehensiveness of federal legislation in the field, or by assessing the dominance of the federal interests reflected in that legislation. *See supra* at Section II.C.1. But those are not the only means of divining Congressional intent. There may be cases where—even absent the direct means of express preemption, on the one hand, or an applicable savings clause, on the other—a statute's text indirectly reveals whether Congress intended its rules to be exclusive in a particular field.

This is such a case. The trail starts with NISA's statement that "resolving the problems associated with aquatic nuisance species will require the participation and cooperation of the Federal Government and State governments." 16 U.S.C. § 4701(15). Thus we know that states can—and indeed must—have a role with respect to ANS "problems"; the question, then, is whether that role is limited to ANS "control," or extends also to "prevention."

Other sections of NISA provide an answer to that question. In § 4723—entitled, sensibly enough, "Regional coordination"—Congress ordered the creation of a "Great Lakes panel" to "coordinate, where possible, aquatic nuisance species program activities in the Great Lakes region that are not conducted pursuant to this chapter." *Id.* § 4723(a)(1)(D). The term "[a]quatic nuisance species program activities" is defined by § 4722 to include not only ANS "control" measures, *see* § 4722(e), but also ANS "*[p]revention*" measures "to minimize the risk of introduction of aquatic nuisance species to waters of the United States. *Id.* § 4722(c). Thus we know that Congress contemplated ANS prevention measures "in the Great Lakes region that *are not conducted pursuant to this chapter*." *Id.* § 4723(a)(1)(D) (emphasis added).

That leaves only the question whether the reference to ANS prevention measures "not conducted pursuant to this chapter" includes measures conducted by the states. For several reasons, we believe that it does. First, the federal statutes addressing the problem of ANS—namely, NISA and NANPCA—of course fall within NISA's "chapter." That suggests that the entities conducting the activities referenced in § 4723(a)(1)(D) are acting pursuant to state, rather than federal, authority. Second, the activities are to be "coordinate[d]" by a "Great Lakes panel" that includes representatives of "State and local agencies[.]" *Id.* § 4723(a)(1). Given that state agencies typically

do not "coordinate" the activities of federal agencies, this language too suggests that the referenced activities are conducted by the states.

NISA's next section makes this conclusion inescapable. That section invites (but does not require) state governors to submit "state aquatic nuisance species management plans," *id.* § 4724, to a "Task Force" comprised of senior federal officials, including the Commandant of the Coast Guard, the Secretary of Agriculture, and the Director of the United States Fish and Wildlife Service. *Id.* § 4721. These plans should, among other things, "identify and describe *State and local programs for* environmentally sound *prevention* and control *of the target aquatic nuisance species*." *Id.* § 4724(a)(2)(A) (emphasis added). That reference standing alone makes clear that Congress intended for state ANS prevention measures to continue after the enactment of NISA.

Moreover, if the Task Force approves a state's plan, the state is eligible to receive grants from the United States Fish and Wildlife Service. *Id.* § 4722(b)(1). Thus, not only does NISA make clear that state ANS prevention measures are permissible; it actually expresses a conditional willingness to *pay* for them.

NISA's text thus reveals that Congress expressly contemplated ANS prevention measures—in the "Great Lakes region" no less, *id.* § 4723(a)(1)(D)—that are conducted by the states. Indeed, it encourages them. Federal law therefore does not preempt the field of ANS prevention measures.

It bears mention that the Coast Guard—which is the agency administering NISA, *see* 16 U.S.C. §§ 4711(b)(1), 4702(12)—agrees with our conclusion. The Coast Guard stated in 2004 that

> *the congressional mandate is clearly for a Federal-State cooperative regime in combating the introduction of [ANS]* into U.S. waters from ship's [sic] ballast tanks. This makes it unlikely that preemption, which would necessitate consultation with the States under Executive Order 13132, will occur.

69 Fed. Reg. 32864, 32868 (emphasis added). Moreover, in response to comments requesting that the Coast Guard coordinate its ballast-water-management program with state programs to "eliminate duplicative reporting requirements," the Coast Guard expressly stated that "*each State is authorized under NISA to develop their own regulations if they feel that Federal regulations are not stringent enough.*" *Id.* at 32865 (emphasis added). That is precisely what Michigan has done here.

In 2005, the Coast Guard reiterated its position that NISA does not preempt state ANS prevention measures. Specifically, in response to a comment—similar to Plaintiffs' complaints here—that "a federal approach to preventing invasions in the Great Lakes is needed whereas a State-by-State piece-meal approach is not," the Coast Guard responded:

> The Coast Guard agrees that a federal approach is more amenable than a patch-work of state NOBOB management programs. . . . However, *NISA does allow for states to develop their own [ANS] prevention measures*.

70 Fed. Reg. 51831, 51832 (emphasis added). That is an unequivocal recognition that NISA does not preempt the field of ANS prevention. And the Coast Guard made that recognition notwithstanding the same policy objections that Plaintiffs make here.

Plaintiffs assert that the Coast Guard had earlier taken a contrary view. Specifically, in promulgating its 1993 Great Lakes regulations—which required oceangoing vessels carrying ballast water from beyond the EEZ either to conduct a saltwater ballast-water exchange or to retain their ballast water—the Coast Guard made the following statement, under the heading, "Federalism":

> Standardizing the minimum requirements for vessels entering the Great Lakes after operating in waters beyond the EEZ is necessary to effectively help prevent additional introductions of nonindigenous species. Therefore, the Coast Guard intends this rule to preempt State and local regulations that are *inconsistent* with the requirements of this rule.

58 Fed. Reg. 18330, 18333 (emphasis added).

Contrary to Plaintiffs' contention, however, this statement envisions a conflict-preemption regime, not a field-preemption one. The statement actually implies that the Coast Guard interprets NISA to allow state ANS prevention regulation. Indeed, the whole predicate of this statement is that states *can* impose additional prevention requirements on vessels entering the Great Lakes, so long as those requirements are not "inconsistent with" the Coast Guard's own "minimum" requirements. Thus, contrary to Plaintiffs' assertion, this statement is entirely consistent with the Coast Guard's later statements that NISA does not preempt the field of ANS prevention.

Plaintiffs also argue that the federal interest in "international maritime regulation" supports a finding of field preemption here. Appellants' Br. at 37. It is true, as Plaintiffs point out, that the Supreme Court emphasized the federal interest in "national and international maritime commerce" in *United States v. Locke,* 529 U.S. 89, 108 (2000). But the *Locke* Court discussed that interest primarily in holding that "in this area there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers." *Id.* Accordingly, we have not applied any such "beginning assumption" in favor of preserving state regulatory power here.

What *Locke* does not do is convert a statutory inquiry into a metaphysical one. Plaintiffs essentially argue that certain aspects of maritime commerce are inherently federal and thus not subject to state regulation of any kind. And they cite various passages from *Locke* in support of that argument. Plaintiffs fail to recognize, however, that the passages they cite from *Locke*—concerning, for example, "tanker" operation and staffing, and "tanker" design and construction, Appellants' Br. at 43, 46— are themselves based on a *federal statute*, namely, the Ports and Waterways Safety Act of 1972 ("PWSA"). Thus, contrary to Plaintiffs' implication, the issue in *Locke* was not whether, in the nature of things, maritime regulation is somehow inherently federal. The issue instead was "the scope of appropriate local regulation *under the PWSA*[.]" *Locke*, 529 U.S. at 108 (emphasis added). Accordingly, *Locke* held that *"Title II of the PWSA"*—and not some abstract federal interest in maritime regulation—establishes a field preemption regime with respect to "the 'design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning' of tanker vessels." *Id.* at 112 (quoting 46 U.S.C. § 3703(a)) (emphasis added).

The problem with Plaintiffs' argument, then, is that it is unmoored to any federal statute. No one contends that the PWSA applies here. The PWSA "applies to a tank vessel[,]" 46 U.S.C. § 3702(a), which is in turn defined to "mean[] a vessel that is constructed or adapted to carry, or that carries, *oil or hazardous material in bulk* as cargo or cargo residue[.]" 46 U.S.C. § 2101(39) (emphasis added). None of the Plaintiffs allege that its ships include oil tankers, or that the PWSA otherwise applies in this case.[3] Consequently, *Locke*'s specific holdings regarding the PWSA's preemptive effect upon various aspects of tanker regulation are simply inapposite in this case. Plaintiffs have identified no federal interest that supports a finding that Congress intended to preempt the field of ANS prevention.

---

[3] We therefore express no view as to whether any aspect of the Ballast Water Statute would be preempted as applied to oil tankers that are themselves subject to the PWSA.

b.

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Hillsborough County*, 471 U.S. at 713. Conflict preemption occurs when either (1) "compliance with both federal and state regulation is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

Here, it is not physically impossible to comply with both Michigan's permit requirement and NISA. Pursuant to the permit requirement, owners of "oceangoing vessels engaged in port operations" in Michigan must pay $225 in fees and fill out several forms. Mich. Comp. Laws § 324.3112(6). None of those things is impossible.

Nor does the Ballast Water Statute "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. NISA's purpose is "to prevent unintentional introduction and dispersal of nonindigenous species into waters of the United States through ballast water management and other requirements." 16 U.S.C. § 4701(b)(1). That purpose is shared, not obstructed, by the Ballast Water Statute. The Statute furthers that purpose by requiring vessel owners to provide information to the MDEQ regarding their ballast-water practices. Vessels that do not discharge ballast water in Michigan must provide a certification to that effect. Vessels that will discharge ballast water must submit information such as the date of their last ballast discharge, the origin of their ballast water, and the volume of their proposed discharge. None of this obstructs NISA's purposes in the least.

The permit requirement does not conflict with NISA or the Coast Guard's regulations promulgated pursuant to it. The requirement therefore is not preempted by federal law.

D.

Plaintiffs claim the Ballast Water Statute violates the so-called "dormant" Commerce Clause because, they say, the Statute burdens interstate commerce. It is undisputed—before this Court at least—that the Ballast Water Statute does not "favor in-state economic interests over out-of-state interests." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). It instead imposes its burdens evenhandedly. Statutes that so impose their burdens "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The Ballast Water Statute need not provide a perfect solution to the problem of ANS in order to pass this test. Plaintiffs conceded in the district court that "[i]nvasive species pose a serious threat to the ecosystem," and are "an acute problem which must be solved." *See also* Appellants' Br. at 9 ("non-indigenous species may disrupt the local aquatic ecosystem, killing or displacing native fish and plant life"). Moreover, as noted above, Congress predicted in 1990 that—wholly apart from ecological harm—economic harm from the zebra mussel alone could total $5 billion by the year 2000. 16 U.S.C. § 4701(4). Thus, to the extent the permit requirement even marginally reduces the problem of ANS introduction, its local benefits would be very large.

In contrast, the burdens imposed by the permit requirement—an application fee of $75, a yearly fee of $150, and the completion of a few forms—are *de minimis*. *See Ferndale Labs., Inc. v. Cavendish*, 79 F.3d 488, 495 (6th Cir. 1996) (rejecting a Commerce Clause challenge to an Ohio statute requiring all wholesalers of prescription drugs to fill out a two-page registration application and pay a $100 annual fee, because, *inter alia*, "[w]e do not consider the $100 fee a burden").

The district court therefore held that Plaintiffs could not, under any circumstances, show that the permit requirement's burdens clearly exceeded its benefits. Plaintiffs argue, however, that the issues of benefit and burden are factual in nature, and that they should be permitted to develop a record on those issues before their claim is adjudicated.

We need not await that factual development to affirm the dismissal of Plaintiffs' claim. Indeed, there is no need to conduct the *Pike* balancing at all. The reason, as explained below, is that the Commerce Clause has not been dormant here.

The Commerce-Clause power belongs to Congress, not the courts. The purpose of the dormant Commerce-Clause doctrine is to "safeguard[] Congress' *latent* power from encroachment by the several States." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154 (1982). Accordingly, "we only engage in [dormant Commerce-Clause] review when Congress has not acted or purported to act." *Id.* "Once Congress acts, courts are not free to review state taxes or other regulation under the dormant Commerce Clause." *Id.*

NISA was an exercise of Congress's power under the Commerce Clause. And in enacting NISA, as shown above, Congress expressly contemplated, and indeed encouraged, state participation in ANS prevention measures. We would lose our constitutional bearings if we were to hold that the Commerce Clause, in its dormancy, strikes down state regulation that Congress, in *actively exercising* its power under the Clause, expressly contemplated. We therefore affirm the dismissal of this claim.

E.

Only Plaintiffs' substantive due process claim remains. Plaintiffs argue that, "[b]y purporting to require owners and operators of oceangoing vessels to procure permits to operate even if they do not discharge ballast water containing aquatic nuisance species . . . [,] the Ballast Water Statute deprives plaintiffs of their property without due process of law in contravention of the Fourteenth Amendment of the United States Constitution." Compl. ¶ 22.

It is undisputed that the permit requirement is subject only to rational-basis review. Accordingly, the permit requirement "need only be rationally related to a legitimate government purpose" to be upheld. *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001). This test is "highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 501 (6th Cir. 2007). "[A]ny *conceivable* legitimate governmental interest" will do, *37712, Inc. v. Ohio Dept. of Liquor Control,* 113 F.3d 614, 620 (6th Cir. 1997) (emphasis added); and even then it is constitutionally irrelevant whether the conceivable interest actually underlay the enactment of the challenged provision. *Cf. Doe v. Wigginton*, 21 F.3d 733, 740 (6th Cir. 1994) (citing *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

Here, Michigan has a legitimate state interest in protecting its waters from further introductions of ANS from ballast-water discharges by oceangoing vessels. The permit requirement is rationally related to advancing that interest: it requires vessels to provide the MDEQ with information regarding their ballast water and ballast-water-management practices, thereby allowing the MDEQ to monitor compliance with its requirements. And it requires vessels that say they will not discharge ballast water in Michigan to certify that fact, which may make them more inclined to do as they say, since a false certification is a felony. *See* Mich. Comp. Laws § 324.3115(c)(2). All of this conceivably could reduce the introduction of new ANS into Michigan waters. The permit requirement therefore does not violate Plaintiffs' substantive due process rights.

III.

Michigan, for undisputedly legitimate reasons, has enacted legislation of a type expressly contemplated by Congress.  We have no basis to disrupt the result of those democratic processes. The August 15, 2007 order of the district court is affirmed.