RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0129p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

IVY BAILEY, et al.,

        *Plaintiffs-Appellees*,

    *v.*

EDWARD CALLAGHAN; CHRISTINE
DERDARIAN; NINO GREEN,

        *Defendants-Appellants*.

No. 12-1803

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-11504—Denise Page Hood, District Judge.

Argued: March 6, 2013

Decided and Filed: May 9, 2013

Before: GIBBONS, KETHLEDGE, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Debbie K. Taylor, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, for Appellants. Philip Hostak, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., for Appellees. **ON BRIEF:** Debbie K. Taylor, William F. Denner, Susan Przekop-Shaw, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, for Appellants. Philip Hostak, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., Arthur R. Przybylowicz, MICHIGAN EDUCATION ASSOCIATION, East Lansing, Michigan, Andrew Nickelhoff, SACHS WALDMAN, P.C., Detroit, Michigan, Mark H. Cousens, Southfield, Michigan, Herbert A. Sanders, THE SANDERS LAW FIRM, P.C., Detroit, Michigan, for Appellees.

    KETHLEDGE, J., delivered the opinion of the court in which GIBBONS, J., joined. STRANCH, J. (pp. 7–20), delivered a separate dissenting opinion.

1

—————————

**OPINION**

—————————

KETHLEDGE, Circuit Judge.    This case presents the question whether the federal Constitution compels Michigan's public schools to collect membership dues for unions that represent public-school employees.  Enacted in 2012, Michigan's Public Act 53 provides:  "A public school employer's use of public school resources to assist a labor organization in collecting dues or service fees from wages of public school employees is a prohibited contribution to the administration of a labor organization." Thus, under the Act, unions must collect their own membership dues from public-school employees, rather than have the schools collect those dues for them via payroll deductions.  The Act does not bar public employers other than schools from collecting membership dues for unions who represent their employees.

The plaintiffs here are a number of unions and union members who think that Public Act 53 violates their rights under the First Amendment and the Equal Protection Clause.    The district court was inclined to agree with them, and thus entered a preliminary injunction barring enforcement of the Act.  The State appealed.

We measure the validity of the district court's injunction by reference to four criteria:

> (1) whether the movant has a strong likelihood of success on the merits; [(2)] whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011).  "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits will often be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (internal quotation marks omitted). The likelihood-of-success factor is determinative here; and because that factor presents

a question of law, we review the district court's application of it de novo. *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

The plaintiffs challenge Public Act 53 facially rather than as applied, which means "they confront a heavy burden in advancing their claim." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted). The theory behind their First Amendment claim runs as follows: unions engage in speech (among many other activities); they need membership dues to engage in speech; if the public schools do not collect the unions' membership dues for them, the unions will have a hard time collecting the dues themselves; and thus Public Act 53 violates the unions' right to free speech.

The problem with this theory is that the Supreme Court has already rejected it. "The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009). Here, Public Act 53 does not restrict the unions' speech at all: they remain free to speak about whatever they wish. Moreover, "nothing in the First Amendment prevents a State from determining that its political subdivisions may not provide payroll deductions" for union activities, *id.*; and payroll deductions are all that Public Act 53 denies the unions here. Seldom is precedent more binding than *Ysursa* is in this case.

But the plaintiffs try to circumvent *Ysursa* in two ways. First, citing the Court's decision in *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788 (1985), the plaintiffs say that the schools' payroll-deduction process is a "nonpublic forum," from which the unions cannot be excluded. But forums, real or virtual, are places where "some form of communicative activity occurs." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). And not even the plaintiffs allege that a payroll deduction—the ministerial act of deducting a particular sum from an employee's paycheck—is itself expressive activity. The administrative process in which that deduction occurs, therefore, is not a forum of any kind. *Compare Am. Freedom Def.*

*Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 892 (6th Cir. 2012) (advertisement space on a city bus was a nonpublic forum).

      *Cornelius* only illustrates what is missing from this case. *Cornelius* involved a challenge to the exclusion of certain groups from the federal government's Combined Federal Campaign, through which nonprofit groups solicited donations from federal employees. Groups participating in the Campaign were allowed to disseminate 30-word written statements about their cause. If an employee decided to donate through the Campaign, the donation could be made through a lump-sum payment or through payroll deductions. But nobody in *Cornelius* argued that the payroll deductions were speech; the issue was whether the 30-word solicitations were. *See* 473 U.S. at 797. Indeed, the Court said at the outset of its analysis that, if the 30-word solicitations were not speech, "we need go no further." *Id*. at 797. *Ysursa* makes clear that payroll deductions are not speech, so we need go no further with the argument here. (That Public Act 53 does not restrict speech distinguishes this case from every one of the cases relied upon by the dissent.)

      The plaintiffs also assert that Public Act 53 is viewpoint-discriminatory in a way that the statute in *Ysursa* was not. There, the challenged statute applied to unions across the board, whereas here, the plaintiffs say, Public Act 53 applies only to unions that represent public-school employees. But there are several problems with this argument. The first—even if one assumes that viewpoint discrimination would be problematic with respect to payroll deductions—is that Public Act 53 by its terms does not discriminate based upon viewpoint. It does not, for example, grant certain unions access to the payroll-deduction process, and deny access to others, based upon whether a union supports or opposes a particular policy position. To the contrary, the Act says nothing about speech of any kind. The Act is therefore facially neutral as to viewpoint, which goes a long ways towards defeating the plaintiffs' facial challenge. *Accord Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 648 (7th Cir. 2013).

      The plaintiffs respond that the Act denies access to the payroll-deduction process based upon who the speaker is—*i.e*., it denies access to certain unions—which the

plaintiffs say is a proxy for viewpoint discrimination. But again the contention is belied by the Act's terms. The Act does not deny payroll-access to particular unions. (Quite the contrary: the State almost certainly continues to collect membership dues for a number of the plaintiff-unions here—*e.g.*, local chapters of AFSCME and the Service Employees International Union—albeit from employees in agencies other than public schools.) Instead, Public Act 53 bars public-school employers from using their resources to collect membership dues on behalf of any union. The particular union to which an employee belongs, therefore, is irrelevant to whether a public employer can collect the employee's membership dues. What matters, instead, is who the *employer* is. And thus—even if one accepts the plaintiffs' speaker-as-proxy-for-viewpoint theory—the Act is as neutral to speaker identity as it is to viewpoint.

What the plaintiffs are left with, then, is an argument that we should look past the Act's facial neutrality as to viewpoint and union identity, and conclude nonetheless that the Act's real purpose is to suppress speech by teachers' unions. But the law forecloses this kind of adventure. In another speech case, the Supreme Court said: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). That principle binds us here; and thus, like the Seventh Circuit in a virtually identical case, we will not "peer[] past" the text of Public Act 53 "to infer some invidious legislative intention." *Walker,* 705 F.3d at 649–50.

So Public Act 53 does not restrict speech; it does not discriminate against or even mention viewpoint; and it has nothing to do with a forum of any kind. Instead, the Act merely directs one kind of public employer to use its resources for its core mission rather than for the collection of union dues. That is not a First Amendment concern. *See Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546 (1981) ("We again reject the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State") (internal quotation marks omitted).

Only the plaintiffs' equal-protection claim remains. "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong

presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). Such a classification is constitutional "so long as it bears a rational relation to some legitimate end." *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (internal quotation marks omitted). This test is highly deferential: "any *conceivable* legitimate governmental interest will do; and even then it is constitutionally irrelevant whether the conceivable interest actually underlay the enactment of the challenged provision." *Fednav, Ltd. v. Chester*, 547 F.3d 607, 624–25 (6th Cir. 2008) (emphasis in original) (citations, brackets, and internal quotation marks omitted).

The applicability of rational-basis review is a strong signal that the issue is one for resolution by the democratic process rather than by the courts. This case is no exception. Public Act 53 proscribes the "use of public school resources" for collection of union dues, but does not bar other state or local employers from using their resources for that same purpose. *See* Mich. Comp. Laws § 423.210(1)(b). The question here is whether there is any conceivable legitimate interest in support of this classification. We hold that there is: the Legislature could have concluded that it is more important for the public schools to conserve their limited resources for their core mission than it is for other state and local employers. The plaintiffs' equal-protection claim therefore fails.

We hold that the plaintiffs' claims under the First Amendment and the Equal Protection Clause are both without merit. The plaintiffs therefore have no chance of success on those claims, which means the injunction should not have issued.

The district court's June 11, 2012 order granting the plaintiffs' motion for a preliminary injunction is reversed, and the case remanded for further proceedings consistent with this opinion.

———————————

## DISSENT

———————————

STRANCH, Circuit Judge, dissenting. The majority spills little ink in its dismissal of the school unions' free-speech challenge. In doing so, it mischaracterizes the First Amendment interests at stake, glosses over key distinctions the Supreme Court requires us to observe, and averts its gaze from Act 53's blatant viewpoint discrimination. Most concerning to me, however, is the majority's refusal to engage in an analysis of viewpoint discrimination in light of Michigan's explicit statement that the law's purpose is to put a "check on union power." The foundational requirement of viewpoint neutrality means little if a state may legislate with impunity to cripple the power of an unpopular group whose political views are objectionable to the state. The unanswered constitutional question in this case is whether the government may burden expression it disagrees with by *selectively* restricting access to public resources that facilitate that expression. The answer is no. The majority wrongly concludes otherwise.

## I. Background

A fuller description of the context in which this dispute arises is needed. Plaintiffs here are unions that represent school-district employees, including teachers and support personnel, in Michigan's public schools. Like other unions, the school unions represent their members' interests at the bargaining table. But because issues in public-school workplaces depend so heavily on legislative policy choices, they also engage in political action and public-advocacy efforts. The school unions fund their work through membership dues and service fees that teachers are contractually obligated to pay to share in the costs of supporting their organizations.[1]

———————————

[1] Technically, union members pay dues and "non-members" pay fees. The latter are individuals in the bargaining unit who receive the benefits the union negotiates but decline full membership in the organization. *See* Mich. Comp. Laws § 423.210(2). The distinction is not important to this case, so I use the term "dues" to refer to both dues and fees, and "members" to refer to both members and non-members. Also, although the school unions represent several types of employees, I call them "teachers" for ease.

Teachers pay dues by remitting small amounts of money on a regular basis. The transaction costs involved in collecting dues from tens of thousands of individuals every month or two can be great. So the school unions have negotiated provisions in their contracts with school districts to allow teachers to choose to have their dues deducted directly from their paychecks and transmitted to their unions. A teacher's dues deduction choice is just one part—or, more accurately, just one database field—in a school district's payroll-deduction system that is used to remit voluntary payments to many organizations, including charities, insurance carriers, retirement plans, and financial-investment institutions.

For teachers, payroll deduction is a convenience akin to the auto-pay option many banks offer customers to pay recurring bills. For school districts, the costs associated with directing funds to the school unions via the automated payroll system are minimal or, where reimbursed by school unions, nonexistent. And for school unions, payroll deduction enables them to devote their resources to core functions—political action, collective bargaining, and member representation—rather than collections work.

Michigan's Public Employment Relations Act (PERA) has regulated collective bargaining between governmental employers and public-employee unions since 1966. *See* Public Act 379 of 1965, codified as amended at Mich. Comp. Laws §§ 423.201–423.217. PERA covers a wide range of employees besides teachers, including municipal workers, police officers, firefighters, healthcare providers, and higher-education employees. *See Cent. Mich. Univ. Faculty Ass'n v. Cent. Mich. Univ.*, 273 N.W.2d 21, 26 (Mich. 1978)). It restricts public employers and unions from engaging in certain "unfair labor practices." *See* Mich. Comp. Laws § 423.210. Relevant here, Section 10(1)(b) makes it an unfair labor practice for public employers to "[i]nitiate, create, dominate, contribute to, or interfere with the formation or administration of any labor organization." *Id*. § 423.210(1)(b). In the 46 years of its existence, payroll deductions have never been thought to violate this provision.

Act 53 intended to change all of that. With its passage in March 2012, Michigan's legislature declared that "a public school employer's use of public school

resources to assist a labor organization in collecting dues or service fees from the wages of public school employees is a prohibited contribution to the administration of a labor organization." *Id*. Michigan explained that the statute would save money, promote union accountability, and provide a "check on union power."

Act 53 affects *only* unions that represent school employees. Unions whose members work for *any* other PERA-regulated public employer remain free to collect dues using public-payroll systems. So the school unions filed suit, alleging that Act 53's selective ban violates the Equal Protection Clause of the Fourteenth Amendment, and discriminates against disfavored speakers in violation of the First Amendment. The district court granted the preliminary injunction they sought to bar Act 53's implementation. It reasoned that Act 53 "necessarily diminishes" the school unions' ability to fund expressive speech, and so cuts into a protected speech interest. And it concluded that the rationales the state advanced for this underinclusive law did not answer the charge that Michigan targeted school unions *because of* its disagreement with their viewpoint.

I, too, think the school unions' First Amendment challenge can succeed. Here is why.

## II. *Ysursa* does not control

From the start, the majority veers off course in its insistence that the Supreme Court has already rejected the school unions' First Amendment theory. *See* Maj. Op. at 3. *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009), which the majority believes resolves this matter, concerned a First Amendment challenge to Idaho's ban on payroll deductions for political activities. In it, the Court held that the First Amendment "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression." *Id*. at 355. "Idaho's law does not restrict political speech, but rather declines to promote that speech by allowing public employee checkoffs for political activities." *Id*.

Two observations were integral to the Court's resolution of the case. First, Idaho's law applies to all deductions for political activities, not just a disfavored few. *Id.* at 361 n.3. Second, there was no suggestion that the law is "aim[ed] at the suppression of dangerous ideas." *Id.* at 359 (internal quotation marks omitted); in other words, the law does not impermissibly discriminate on the basis of viewpoint.[2] The Court concluded that Idaho's ban does not infringe the First Amendment and only requires the state to "demonstrate a rational basis to justify" it. *Id.*; *but see id.* at 361 n.3 (noting that a First Amendment challenge could be brought to Idaho's evenhanded ban if it were not enforced evenhandedly).

Little controversy, then, surrounds *Ysursa*'s holding that the Constitution does not require a state to facilitate *all* union speech by providing for universal payroll deductions, or to decline to do so for *all*—evenhandedness is the operative requirement. But *Ysursa* does not answer what happens when an enactment evades this requirement. And that, of course, is the question before us—whether Michigan's choice to *exclude just one subset of unions* from the speech-facilitating mechanism of payroll deduction violates the First Amendment.

In such a case, *Ysursa* teaches that restrictions based on an excluded party's disfavored viewpoint *can* infringe the First Amendment. To Justice Breyer's concern that Idaho's ban might be applied inequitably, the *Ysursa* majority reiterated that the law "by its terms" applies across-the-board, prohibiting "all employers" from using the payroll-deduction system to remit funds to all political organizations for all political issues, "regardless of viewpoint or message." *Id.* at 361 n.3. But if "the ban is not

---

[2]The Supreme Court uses the phrase "aim[ed] at the suppression of dangerous ideas," 555 U.S. at 359, interchangeably with the term "viewpoint discrimination," as well as other formulations in the government-subsidy context. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995) ("Although acknowledging that the Government is not required to subsidize the exercise of fundamental rights, we reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that the case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas.") (internal quotation marks, alterations, and citation omitted); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (noting the Court's prior formulations of "invidious viewpoint discrimination" in the provision of subsidies that "raises concern about the suppression of disfavored viewpoints" include a government's "leverag[ing] its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints"; "aim[ing] at the suppression of dangerous ideas"; "manipulat[ing]" subsidies to have a "coercive effect"; and "impos[ing] . . . a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace") (internal quotation marks omitted).

enforced evenhandedly," the Court allowed, plaintiffs could "bring an as-applied challenge."[3] *Id.* As the parties in *Ysursa* agreed that no viewpoint discrimination was afoot, the Court had no occasion to apply this principle. *Id.*

Thus, the majority's conclusion here that precedent is "[s]eldom . . . more binding than *Ysursa* is in this case," Maj. Op. at 3, is true only to the extent that *Ysursa* expressly acknowledges the long-standing prohibition on viewpoint discrimination in the provision of government subsidies, while recognizing its inapplicability in that case. But *Ysursa* does not control analysis of a law that *selectively* prohibits access to payroll deductions to one group—school unions—allegedly to stifle expression of their disfavored viewpoint, but permits it to every other PERA-regulated union. The First Amendment interests here are clearly different than in *Ysursa*, where the parties agreed that there was no viewpoint-discrimination claim. And, more, the school unions' allegation that Act 53 seeks to suppress their political viewpoint is precisely the kind of claim of impermissible discrimination we are duty-bound to scrutinize. The majority ignores this fundamental distinction, and mistakenly concludes that hidden viewpoint discrimination that may inhere in a selective payroll-deduction ban is not a First Amendment concern. I disagree.

Before addressing whether Act 53 is or is not impermissibly discriminatory, the viewpoint-neutrality requirement as understood in our circuit must be explained.

### III. Viewpoint neutrality

I begin with the basics of the viewpoint-neutrality requirement. The government may violate the First Amendment if it regulates speech based on its substantive content or the message it conveys. *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). But when it suppresses "particular views . . . on a subject," the violation is "all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

---

[3]*Ysursa*'s conclusion that a party may bring a First Amendment challenge to a law that selectively bars access to payroll deductions, allegedly on the basis of viewpoint, should resolve the majority's doubts that the viewpoint-neutrality requirement applies in this context. *See* Maj. Op at 4 ("even if one assumes that viewpoint discrimination would be problematic with respect to payroll deductions").

Such viewpoint discrimination occurs when the government restricts speech because of "the specific motivating ideology or the opinion or perspective of the speaker," *id.*, or "solely to suppress the point of view he espouses," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

Sometimes viewpoint discrimination is obvious. If, for example, the government permits anti-war speakers to protest in a public building, but prohibits pro-war speakers from doing the same, few would deny the viewpoint-based discrimination in that scenario. Often, though, the issue is more nuanced because many debatable public issues do not reduce to a simple "pro" and "con" dichotomy. Recognizing this, the Supreme Court has rejected the "insupportable assumption that all debate is bipolar." *Rosenberger*, 515 U.S. at 831 ("Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas."). Instead, the Court's capacious conception of viewpoint requires sensitivity to the danger that speech restrictions may skew the contest of ideas. *See id.* at 832.

The prohibition on viewpoint discrimination operates as a check on the government's ability to prefer one point of view over others on the same topic. It serves to snuff out official actions calculated to drive "certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). And it applies both when the government selectively restricts speech, *see, e.g.*, *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011), and when it selectively facilitates it, *see, e.g.*, *Rosenberger*, 515 U.S. at 834 (government "may not discriminate based on the viewpoint of private persons whose speech it facilitates"). Of course, the government has no obligation to promote the expressive activities of private actors. But when it does so on behalf of those who advance a favored political, ideological, or philosophical perspective, its denial of the same promotion to others who advance a disfavored view comes at the cost of raising a suspicion of viewpoint discrimination.

The majority observes that Act 53 is "facially neutral as to viewpoint, which goes a long ways towards defeating the plaintiffs' facial challenge." Maj. Op. at 4. But the facial neutrality of a speech regulation does not resolve its legitimacy. We have never been so naive as to expect the government to admit it is engaging in viewpoint discrimination. And so our precedents have long recognized the possibility of hidden viewpoint discrimination. Even when a justification for a speech restriction is facially neutral, "the government nevertheless violates the First Amendment when its stated purpose in reality conceals a bias against the viewpoint advanced by the excluded speakers." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355–56 (6th Cir. 1998) (citing *Cornelius*, 473 U.S. at 811).

Moreover, it is the court's duty to ferret out hidden viewpoint bias by "independent[ly] determin[ing] . . . whether the government's rules and [their] application . . . are reasonably related to the government's policy objectives." *Id.* at 357. We can fulfill this duty only if we assure that the state proves "the links in its chain of reasoning." *Id.* (internal quotation marks omitted).

How does a court accomplish its task? Precedent suggests at least three attributes of a law impacting speech that can help us identify whether a seemingly neutral justification masks impermissible viewpoint exclusion. First, "the underinclusiveness of a law—i.e., the failure of the government to regulate other, similar activity—may give rise to a conclusion that the government has in fact made an impermissible distinction on the basis of the content of the regulated speech." *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 411 (6th Cir. 1997). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 131 S. Ct. at 2740.

Second, official statements and actions justifying a viewpoint-neutral enactment may evidence a facade for viewpoint-based discrimination. As every law student quickly learns, and the majority points out, courts do not simply "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). But the Supreme Court has made

clear that we *may* examine motive when considering speech restrictions that allegedly discriminate on the basis of viewpoint. In *Cornelius*, for example—a case in which the plaintiffs' allegation of viewpoint discrimination was not decided by the district court or fully briefed before the Supreme Court—the Court remanded the case in part for the district court to decide whether the contested regulation was "impermissibly motivated by a desire to suppress a particular point of view." 473 U.S. at 812–13. And in *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 49 n.9 (1983), another case in which viewpoint discrimination was alleged, the Court scoured the record before finding "no indication . . . that the policy was motivated by a desire to suppress" the excluded group's views.

Third, suspicion of hostility to a particular viewpoint arises if a speech restriction poorly serves the viewpoint-neutral ground; "where, in other words, the fit between means and ends is loose or nonexistent." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004); *see also* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 455 (1996) ("[T]he looser the fit between the interest asserted and the contours of the law, the greater the cause for suspicion. . . . [W]hen the asserted interest is insubstantial or when it does not fit the scope of the challenged regulation[,] the usual presumption of proper purpose topples[.]").

The majority refuses to "look past the Act's facial neutrality" because it believes "the law forecloses this kind of adventure." Maj. Op. at 5. But applying our precedents is hardly a foray into adventure. And we cannot close our eyes when those precedents instruct us to determine whether viewpoint discrimination hides behind a facially neutral law. At a minimum, this means putting the state through its paces by assessing its justifications for Act 53's selective ban. I understand this examination to be our obligation.

Against this backdrop, I turn to whether Act 53 is, in fact, viewpoint neutral.

### IV. Act 53 discriminates on the basis of viewpoint

While Act 53 is facially neutral as to viewpoint, it impermissibly discriminates against school unions because Michigan disagrees with the positions they advocate. School unions have a particular viewpoint that Act 53 seeks to muzzle. They are large and well-funded advocacy organizations that actively push for spending allocations and legislative enactments that other PERA-regulated unions do not share—and, in fact, often oppose when it comes to deciding how to split the pie of finite public resources. The priorities of unions representing firefighters, transit workers, or hospital employees, for example, do not include increasing school funding or safeguarding teacher-tenure protections. The school unions' colorable theory is that the state's distaste for the pro-teacher viewpoint they strongly and consistently espouse in funding and legislative debates led Michigan to enact Act 53 to mute their voice.

The majority refuses to acknowledge that school unions have a particular viewpoint, and that Act 53's burden falls only on speakers who advance that viewpoint. Instead, it concludes the law is neutral as to the identity of a union, as it regulates only the ability of certain public employers (school districts) to collect dues on behalf of any union. Maj. Op. at 5. This argument begs the question. The identity of the entity the law regulates does not define the identity of the entity on whom its burden falls. Imagine a law that prohibited public-school employers from allowing anti-abortion organizations to distribute literature on school grounds, but did not bar the employers from allowing pro-abortion advocates to do the same. Observing that the rule only regulates what certain public-school employers may do without reference to the speaker's identity would do nothing to quiet an anti-abortion organization's claim of viewpoint discrimination. Here, too, the fact that Act 53 technically regulates school districts does not answer a charge that it functionally burdens the expression of a group of speakers bound together by a single shared viewpoint.

We analyze the school unions' claim of hidden viewpoint bias by "engag[ing] in an independent determination of whether [Act 53] . . . [is] reasonably related to [Michigan's] policy objectives." *United Food*, 163 F.3d at 357. An examination of the

three allegedly neutral justifications for Act 53 that Michigan offers—saving money, promoting union accountability, and providing a "check on union power"—makes plain that the state's selective ban is not viewpoint neutral.

*Michigan's first justification* is that Act 53 saves money spent administering a payroll-deduction system. This justification suffers from three flaws as an explanation for Michigan's differential treatment of school unions. The first is that Michigan "cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity." *Rosenberger*, 515 U.S. at 835. Instead, it must "ration or allocate . . . scarce resources on some acceptable neutral principle." *Id.* "[S]carcity [does not] give the State the right to exercise viewpoint discrimination that is otherwise impermissible." *Id.*

The second is that this justification highlights the underinclusiveness of the law. Michigan may deny all organizations access to its payroll-deduction system solely to save the state money. But it cannot justify unequal access to this speech-facilitating mechanism to a group that is indistinguishable from another group to whom access is given. "When speakers and subjects are similarly situated, the state may not pick and choose." *Perry*, 460 U.S. at 55. Act 53's underinclusiveness does not help to dispel an allegation of viewpoint discrimination.

Finally, the cost-savings justification has a factual problem. Although Michigan is not required to produce irrefutable proof, "mere conjecture [is] [in]adequate to carry a First Amendment burden." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000). The trouble is that Michigan's nonpartisan House Fiscal Agency determined the bill would have "no significant fiscal impact on school districts" because the deduction process is largely automated and, in some cases, its costs are reimbursed by the school unions. The district court also found Michigan failed to show that Act 53 would save money. Given that Act 53 does not eliminate existing payroll-deduction systems, but only removes the one field in a database that earmarks school union dues, the state's inability to substantiate its justification is unsurprising.

*Michigan's second justification* for Act 53—that it enhances a union's accountability to its members—fares no better. The state reasons that if dues are not deducted from teachers' paychecks, unions will be forced to make affirmative efforts to collect those funds, and union leaders will be more accountable to their members. The accountability justification does not assure me that Act 53 is viewpoint neutral for two reasons. The first, again, is its underinclusiveness. If not deducting dues from employee paychecks conceivably makes unions more accountable—which is not at all clear—then surely members of other PERA-regulated employers would similarly benefit from more answerable organizations. Michigan's failure to similarly promote the accountability of those employees' unions suggests that Act 53 targets teachers because the state disagrees with their point of view.

Moreover, consider how specious the logic of the accountability justification is. How exactly can teachers hold union leaders more accountable if they have to pay their dues in person or by mail, rather than by payroll deduction? Michigan's argument ignores two key facts. First, whatever method teachers use to remit dues, they are still obligated to pay them. If a credit card company no longer allows customers to pay their bills by automatically deducting monthly payments from their checking accounts, its customers still have to pay their bills. Michigan's accountability rationale also is blind to the fact that paying dues via payroll deduction is entirely voluntary. Only teachers who *choose* to do so use it to pay dues. Eliminating one method by which a teacher can elect to pay a bill does not make the organization she must pay it to any more accountable.

*Michigan's third justification* for Act 53 is that it puts a "check on union power." The school unions suggest that this justification is bound up with evidence they presented to show that Act 53 was enacted in retaliation for the unions' political activities against the state's Republican-controlled legislature. The Speaker of Michigan's House of Representatives, for example, told the press that the Michigan Education Association had "declared war" by supporting the recall of backers of legislation the unions opposed. And later, the leader of the state senate opined that the

union had "lost [its] way," and that teachers "should no longer be forced to join" it. Where, as here, "the speech restricted is speech critical of the government," hidden viewpoint discrimination plausibly lurks precisely because "there is a strong risk that the government will act to censor ideas that oppose its own." *Ridley*, 390 F.3d at 86 (citing *Texas v. Johnson*, 491 U.S. 397, 411–17 (1989)).

The legislative proponents of Act 53 explained the check-on-union-power justification in the following way. Without Act 53, they warned, "unsustainable public employee benefits and compensation will continue to threaten the financial integrity of [Michigan's] public institutions." The cause of this problem is that the management team that negotiates with school unions is "often made up of elected officials, some of whom have won their elected offices with the assistance—both personal and financial—of public sector union members." Thus compromised, the management team "does not take a tough stance" on salaries and working conditions, leading to compensation for teachers that increases "beyond the ability of taxpayers to pay."

I see at least two problems with this justification. The obvious one is that this rationale, like the others Michigan offers, is "wildly underinclusive." *Brown*, 131 S. Ct. at 2740. It invokes an oft-repeated criticism that presumably applies to all public-employee unions, not just school unions. *See, e.g.*, Jarrett Skorup, *The Public Employee Union Problem*, Michigan Capitol Confidential, Jan. 12, 2013, http://www.michigancapitolconfidential.com/13387 (last visited May 7, 2013).

The bigger problem is that this justification reveals what Michigan probably hoped to hide behind the curtain. To take Michigan at its word is to recognize that Act 53 directly seeks to curtail the ability of school unions to support elected officials—and so to interpose the state into the marketplace of ideas to silence one point of view over others on the same topic. Query how it is that eliminating payroll deduction for school unions alleviates the perceived conflict-of-interest that compromises a school employer's ability to negotiate "tough" contracts with teachers. Logically, the only way that prohibiting payroll deductions can rein in compensation levels negotiated by elected officials "beholden to union supporters" is to make them less beholden by reducing their

reliance on the school unions' political support. And a prohibition on payroll deduction can accomplish that only if it *reduces the resources the school unions have to contribute to elected officials*. Instead of rebutting a charge of viewpoint discrimination, this justification directly supports the school unions' argument that Act 53 is an attempt to silence their viewpoint.

To the extent Act 53's purpose is to cripple the school unions' ability to raise funds for political speech because Michigan's legislature finds that speech undesirable, it is plainly impermissible. Political speech, of course, is a core First Amendment activity that "must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010). And "restrictions distinguishing among different speakers, allowing speech by some but not others," run afoul of the First Amendment precisely because they are "all too often simply a means to control content." *Id.* at 898–99.

This doctrinal prohibition applies not only to laws that directly burden speech, but also to those that diminish the amount of speech by making it more difficult or expensive to speak. *See, e.g.*, *Citizens United*, 130 S. Ct. at 897 (noting that political-action-committee exemption from a corporate-expenditure ban "does not alleviate the [ban's] First Amendment problems [because] . . . PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations"); *Meyer v. Grant*, 486 U.S. 414, 424 (1988) (striking down on First Amendment grounds a Colorado law that prohibited paying individuals to circulate petitions to qualify ballot initiatives because it "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse," and observing that merely "leav[ing] open 'more burdensome' avenues of communication[] does not relieve its burden on First Amendment expression").

Michigan minces few words explaining that it seeks to diminish the funds available to the school unions to cut back on how much speaking they can do. The state's check-on-union-power rationale lays bare its desire to reduce the resources school unions have to express their viewpoint because of Michigan's aversion to what they have

to say.  Like Michigan's other justifications, this one provides no answer to the charge that Act 53 is impermissibly "aimed at the suppression of dangerous ideas."  *Ysursa*, 555 U.S. at 359 (internal quotation marks and alteration omitted).

## V.  Conclusion

The school unions allege that Act 53 is a viewpoint-neutral restriction on its face that is a facade for viewpoint-based discrimination in fact.  A court's job in such a circumstance is to determine if the law is "impermissibly motivated by a desire to suppress a particular point of view."  *Cornelius*, 473 U.S. at 812–13.  This is accomplished by combing the record and scrutinizing the viewpoint-neutral justifications the state offers for the enactment.  Doing so convinces me that Act 53 is motivated by a desire to suppress the school unions' viewpoint, and that Michigan cannot "prove the links in its chain of reasoning" to dispel this claim.  *United Food*, 163 F.3d at 357.  Based on a determination that the school unions' First Amendment claim is likely to succeed, and otherwise satisfies the requirements for a preliminary injunction, I would affirm the district court's order granting the preliminary injunction.  Because I believe that the majority's refusal to engage in the analysis our precedents require has led it to wrongly reverse that order, I respectfully dissent.