NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0359n.06

No. 14-2352

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KAREN STREHLKE, as a friend of AS, a minor; )
LAURA BUCKLEY, as a friend of CB, a minor; )
RENEE CICERONE, as a friend of JC, a minor; )
GINA LIVERPOOL, as friend of OL, a minor; )
NENITA OZORMOOR, as friend of ZO, a minor; )
YVONNE MADDEN, as friend of ZM, a minor; and )
on behalf of themselves and all similarly situated )
members of the class, )
)
    Plaintiffs-Appellants, )
)
v. )
)
GROSSE POINTE PUBLIC SCHOOL SYSTEM, )
Board of Education; JUDY GAFA, President of )
GPPSS Board of Education, in her official capacity; )
THOMAS HARWOOD, GPPSS Superintendent, in )
his official capacity; and M. JON DEAN, GPPSS )
Deputy Superintendent, in his official capacity, )
)
    Defendants-Appellees. )
)

**FILED**
Jun 29, 2016
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

---

**BEFORE:  MOORE, SUTTON, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Plaintiffs, six parents as next friends on behalf of

their minor children,[1] brought this civil rights action against Defendants Grosse Pointe Public

School System Board of Education (Board), Board President Judy Gafa, Superintendent Dr.

---

[1] Plaintiff Nenita Ozormoor is named as friend of ZC.  However, the complaint and other filings correctly identify Ozormoor's child as ZO.

Thomas Hardwood, and Deputy Superintendent Dr. M. Jon Dean (collectively, GPPSS),[2] alleging GPPSS's high-school attendance-zone policy, which establishes attendance areas for GPPSS's two high schools—Grosse Pointe North High School and Grosse Pointe South High School—violates their children's rights under the Fourteenth Amendment to the U.S. Constitution and analogous provisions of the Michigan Constitution. Plaintiffs, who reside in the northwest corner of the City of Grosse Pointe Farms, allege that by placing their children in the Grosse Pointe North High School attendance area, rather than Grosse Pointe South's with all other children who live in Grosse Pointe Farms, GPPSS's attendance-zone policy deprives their children of the equal protection of the laws, freedom of association, and the privileges and immunities of U.S. citizenship. The district court entered summary judgment for GPPSS. We **AFFIRM**.

## I.

### A.

GPPSS operates two high schools that serve six municipalities in eastern Wayne County, Michigan: Grosse Pointe, Grosse Pointe Farms (the Farms), Grosse Pointe Park, Grosse Pointe Woods, and parts of Grosse Pointe Shores and Harper Woods. Grosse Pointe North High School (North) is located in Grosse Pointe Woods; its attendance zone includes Grosse Pointe Woods, GPPSS's portion of Grosse Pointe Shores and Harper Woods, and the area of the Farms north of Moross Road and west of Chalfonte Avenue—i.e., the northwest corner of the Farms. The

---

[2] Plaintiffs named Joan Dindoffer as a defendant in her official capacity as Board President. Dindoffer's tenure on the Board concluded December 31, 2014. Judy Gafa was elected Board President effective January 26, 2015. (GPPSS Br. 7 n.6.) Gafa is automatically substituted as a party. *See* Fed. R. App. P. 43(c)(2). Plaintiffs also named C. Jon Dean as a defendant in his official capacity as Deputy Superintendent for Administration. Dr. Dean's correct name is M. Jon Dean, and his title is Deputy Superintendent for Human Resources and Educational Services. (GPPSS Br. 7 n.7; *see also* Plaintiffs' Resp. to Mtn. for Summary Judgment and Cross-Motion for Summary Judgment, PID 355.)

Farms is home to Grosse Pointe South High School (South). Children residing in Grosse Pointe, Grosse Pointe Park, and all but the northwest corner of the Farms are within South's attendance area. Plaintiffs reside in the northwest corner of the Farms and thus North's attendance area.

In their complaint, Plaintiffs allege that the entirety of the Farms is within South's attendance area, but "in recent years," the Board revised its attendance-area policy "to exclude" children residing in the northwest corner of the Farms from attending South. (Compl. ¶¶ 15–16, 19, PID 69–70.) Since the Board revised the policy, GPPSS has required students in the northwest corner of the Farms to apply to enroll at South.

According to GPPSS's records, however, shortly before GPPSS opened North in 1968, the Board enacted a policy establishing a "boundary line" between the two high schools that coincided with GPPSS's "existing boundary line between Kerby, Monteith and Barnes elementary schools," placing "five elementary school attendance areas" in each high school's attendance area: Barnes, Ferry, Mason, Monteith, and Poupard in the North area and Defer, Kerby, Maire, Richard, and Trombly in the South area. (Fenton Aff. ¶¶ 6, 8–10, PID 270–71; Board Minutes from Dec. 11, 1967, PID 275–76; January 1968 Map, PID 278.) Although Barnes Elementary School closed in 1984, the 1967 high-school boundary line remains in place today. Students who would have attended Barnes attend Ferry and Monteith Elementary Schools, which are both, like Barnes, in North's attendance zone. Children in the disputed area attend Monteith Elementary School in Grosse Pointe Woods, Brownell Middle School in the Farms, and Grosse Pointe North High School. The parties acknowledged at oral argument that GPPSS included the northwest corner of the Farms in Monteith's attendance zone, rather than Kerby's (which is in the Farms), thereby splitting the Farms, because the Board did not want

elementary-school children in the northwest corner of the Farms to have to cross the intersection at Moross Road and Chalfonte Avenue.

The 1967 policy, in effect, draws a line west from Lake St. Clair along the northern border of the Farms to Chalfonte Avenue, then south along Chalfonte Avenue to Moross Road, and then west along Moross Road to Mack Avenue, and continuing through Grosse Pointe Woods to GPPSS's western border. As a result, residents in the northwest corner of the Farms are included in North's attendance area, while the remainder of the Farms is in South's attendance zone.

In addition to the 1967 attendance-area policy, the Board approved an intra-district transfer policy in 1996, prospectively limiting transfers between the attendance areas. The 1996 policy provides that "transfers will be granted if class size, staffing, student groupings, or total enrollment in a particular building are not adversely affected." (Policy, PID 490.) Specifically with regard to the high schools, the Board expressed a "desire . . . to limit the high school enrollment," and prospectively limited transfers between the high schools if a school's "total population 9–12 (excluding special education) is greater than 1,500 and/or [if there is] more than a difference of 300" in the enrollment numbers of the schools. (Policy, PID 491.) Limits on inter-high-school transfers under the policy went into effect in school year 1999–2000, when South's enrollment passed the 1500-student threshold. Since then, GPPSS officials permit students residing in the North attendance area, including Plaintiffs' children, to enroll in South "only for cause." (Fenton Supp. Aff. ¶ 5, PID 484; *see also* PID 280.) The Board revised the 1996 transfer policy in 2008. The 2008 policy no longer limits transfers based on the number of students enrolled or differentials in enrollment numbers. Rather, the 2008 policy allows transfers "if class size, staffing, student groupings, or total enrollment in a particular building are not

adversely affected." (Policy 5111, PID 285.) GPPSS's Administrative Guideline 5111, which accompanies the 2008 policy and establishes various procedures under the policy, states that "generally in-district transfers or a change of an original assignment to a school may be approved if, in the judgement [sic] of the principals of the transferring and receiving schools and central office administration, staffing levels (including current school year and subsequent school years), and student groupings are not adversely affected." (Fenton Aff. ¶ 13, PID 272; Admin. Guideline 5111, PID 287.)

**B.**

After unsuccessfully petitioning the Board to allow all Farms children to enroll in South, Plaintiffs filed this action under 42 U.S.C. § 1983, alleging that the attendance-area policy is irrational and that GPPSS does not provide Plaintiffs' children with educational opportunities on equal terms with other Farms children, in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, § 2 of the Michigan Constitution. Plaintiffs further allege that GPPSS, by enforcing its attendance-zone policy, deprives their children of the privileges and immunities of U.S. citizenship and unconstitutionally interferes with their children's ability to form intimate associations with other Farms students. Plaintiffs requested declaratory relief and an injunction against enforcement of GPPSS's attendance-area policy to the extent it precludes children in the northwest corner of the Farms from attending South.

GPPSS filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and alternatively, for summary judgment pursuant to Rule 56. GPPSS attached to its motion a copy of the Minutes from the Board's December 11, 1967, meeting establishing the high schools' attendance areas and a January 1968, map showing the boundary between North and South.

In response, Plaintiffs filed a "Response to Defendants' Motion for Summary Judgment [Pursuant] to Rules 12(b)(6) & 56 and Plaintiffs' Cross-Motion for Summary Judgment on the Pleading[s] Pursuant to Rule 56," requesting that the district court deny GPPSS's motion and grant summary judgment to Plaintiffs on all their claims. (PID 355.) Plaintiffs argued that when GPPSS announced that the high-school attendance areas would be based on elementary school attendance areas—which carved out a section of the Farms based on traffic safety for the elementary school children—there was wide-spread objection and, in response, GPPSS permitted parents in the disputed area to choose which high school they wanted their children to attend. This practice continued until the 1998–99 school year when GPPSS adopted "a recent arbitrary and capricious attendance policy to exclude a segment of the Farms school population, . . . of mostly low SEV homes and higher than average number of minority residents . . . from attending GP South in the Farms for no compelling reason." (PID 367.) Plaintiffs challenged the assertion that the attendance areas were designed to balance enrollment, citing evidence that when the 1967 attendance boundaries were adopted, South had a lower enrollment than North by over 500 students. Plaintiffs also challenged the present justification for dividing the Farms to balance attendance when GPPSS continues to approve dozens of transfers from North to South. Plaintiffs argued that the attendance-area policy as then being enforced was both arbitrary and capricious and also lacked a compelling justification, and violated their Equal Protection and First Amendment associational rights and deprived them of the Privileges and Immunities guaranteed them as citizens.

The parties filed responsive briefs further elaborating on their positions. Plaintiffs argued that the 1967 policy lacked a rational basis and was ignored for over thirty years, that the policy

excluding the children in Plaintiffs' geographic area was adopted sometime between 2000 and 2008, and that that policy is arbitrary. Plaintiffs also argued for the application of strict scrutiny.

At a hearing on GPPSS's motion to dismiss, the district court inquired whether either party objected to the court deciding the motions for summary judgment. Neither party objected; however, Plaintiffs' counsel almost immediately after asserted a need to discover the number of transfers GPPSS permitted from North's attendance area to South. After hearing argument, the court issued a written decision granting GPPSS's motion for summary judgment, denying Plaintiffs' cross-motion for summary judgment, and denying as moot Plaintiffs' motions for preliminary injunction and class certification. Plaintiffs appeal.

## II.

We review the district court's decision to convert a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) to a motion for summary judgment under Rule 56 for abuse of discretion. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). This court reviews de novo a district court's order granting summary judgment. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 236 (6th Cir. 2015). When reviewing cross-motions for summary judgment, we "'evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party.'" *Hensley v. Gassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Mitchell v. Fankhauser*, 375 F.3d 477, 479 (6th Cir. 2004). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted). Such evidence need

not be in a form that is admissible at trial, but it must be sufficient to show that the nonmovant "can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphases removed).

### III.

Plaintiffs raise three issues on appeal: whether the district court (1) abused its discretion in converting GPPSS's motion to dismiss to a motion for summary judgment without first affording Plaintiffs an opportunity to discover the actual number of students GPPSS permitted to transfer from the North attendance area to South; (2) erred in holding that GPPSS's attendance-area policy survives rational-basis review under the Equal Protection Clause; and (3) erred in concluding that GPPSS's attendance-area policy does not interfere with Plaintiffs' children's associational rights, and in its alternative holding that, even if it does, the interference is not direct and substantial so as to warrant heightened judicial review.[3]

### A.

Plaintiffs first contend that the district court was required to provide them an opportunity for discovery before it converted GPPSS's 12(b)(6) motion to a motion for summary judgment under Rule 56. Federal Rule of Civil Procedure 12(d) provides that if the court, on a 12(b)(6) motion, considers matters outside the pleadings, it must treat the motion as one for summary judgment under Rule 56 and provide the parties with a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Wysocki*, 607 F.3d at 1104. The

---

[3] Plaintiffs do not appeal from the district court's order holding that Plaintiffs' claim under the Fourteenth Amendment's Privileges and Immunities Clause fails as a matter of law. *Strehlke v. Grosse Pointe Pub. Sch. Sys.*, No. 14-11183, 2014 WL 4603482, at *9–10 (E.D. Mich. Sept. 15, 2014). Nor do they appeal the dismissal of their claims under the Michigan Constitution.

nonmovant, however, must inform the court of its need for discovery. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002).

The district court did not err in ruling on the summary judgment motions without affording Plaintiffs an opportunity for the requested discovery because, as discussed below, even assuming the statistics Plaintiffs sought to discover show GPPSS allows more students to transfer to South than reside in this section of the Farms or that a large number of transfers are permitted notwithstanding that more students attend South than North, GPPSS is nevertheless entitled to judgment as a matter of law because such statistics would not show the attendance-zone policy lacks a rational basis. *See Anderson*, 477 U.S. at 248 (material facts are those that might affect the outcome of the case).

**B.**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This provision is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Classifications that "infringe upon fundamental rights" or involve suspect classifications are subject to strict scrutiny and must "be 'narrowly tailored to serve a compelling state interest.'" *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir. 2002) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). However, a classification that neither involves fundamental rights nor proceeds along suspect lines "'is accorded a strong presumption of validity,'" *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)), and is constitutional "'so long as it bears a rational relation to some legitimate end,'" *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 530 (6th Cir. 2007) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).

To successfully challenge such a classification, a plaintiff must prove that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The rational-basis test is highly deferential: In applying the test, "any *conceivable* legitimate governmental interest will do; and even then it is constitutionally irrelevant whether the conceivable interest actually underlay the enactment of the challenged provision." *Fednav, Ltd. v. Chester*, 547 F.3d 607, 624–25 (6th Cir. 2008) (alteration omitted) (citation omitted) (internal quotation marks omitted). The challenging party must "negative every conceivable basis which might support" the enactment, and this court can uphold the statute "under any plausible justification offered by the state, or even hypothesized by the court." *Am. Exp. Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011) (internal quotation marks omitted).

Rational-basis scrutiny applies here. Plaintiffs assert the attendance-area policy interferes with their children's fundamental right to associate and thus must be reviewed under strict scrutiny. But, as discussed below, the policy does not interfere with their children's intimate associations. In addition, Plaintiffs allege that they reside in an area of the Farms that has "mostly low [state equalized value] homes," and a "higher than average concentration of minority residents." (Compl. ¶ 19, PID 70.) They do not, however, contend that GPPSS established the policy to minimize the numbers of minority students attending South, or otherwise enacted the policy with a racially discriminatory purpose or object. And, even if Plaintiffs complaint is understood as asserting, and plaintiff established, that socioeconomic status was a factor, heightened scrutiny would not apply. *See Harris v. McRae*, 448 U.S. 297, 322–23 (1980); *Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir. 1998).

**1.**

Plaintiffs first argue, relying on *Brown v. Board of Education*, 347 U.S. 483 (1954), that the attendance-area policy deprives their children of equal educational opportunities. *Brown* mandates that GPPSS provide "on equal terms" the educational opportunities it undertakes to provide. *Id.* at 493. But, as the district court observed, although "the assumption underlying the filing of this suit must be that South is the superior high school, Plaintiffs have never said as much or explained how attendance at North implicates unequal educational opportunities." *Strehlke*, 2014 WL 4603482, at *6 n.14. Plaintiffs have failed to show that any difference in the quality of the schools implicates *Brown*'s constitutional guarantees.

**2.**

Plaintiffs contend there is no rational basis supporting the policy because many more students are approved for transfer to South each year than the number of 9th graders residing in the northwest corner of the Farms. Plaintiffs' complaint alleged that the original attendance areas were drawn along city lines. Defendants produced records showing that the areas were established along elementary-school lines. Plaintiffs then argued that the 1967 policy was ignored and that the real policy was enacted thirty years later. By the time the district court ruled on the motions, it was clear that Plaintiffs were challenging the joint operation of the 1967 attendance-area policy and the 1996 transfer policy; the undisputed records and the facts taken in light most favorable to Plaintiffs showed that the attendance areas were established in 1967 based on dividing the elementary schools, that children in this section of the Farms were nevertheless permitted to attend South at will, that a transfer policy was adopted in 1996 that prospectively limited transfers based on attendance numbers at both high schools, that the policy was first triggered in the 1999-2000 school year, and that since then, most students in Plaintiffs' area have not been granted permission to transfer, although some unknown number of other

students in the North area have been granted such permission. The exact number was the information Plaintiffs sought to discover, and we will assume for purposes of our analysis that the records would show that more students are granted permission to transfer from North to South than the number living in this section of the Farms seeking to attend South.

GPPSS contends the Board drew the high-school boundary line the way it did in an effort to balance the populations of the two high schools. Plaintiffs argue that at the time the North-South boundary line was adopted, North had more students than South, so there was no reason to exclude Plaintiffs from the South area to balance attendance. But GPPSS drew the lines based on the number of elementary schools in each area, not the actual attendance numbers at the time. It then routinely permitted students in Plaintiffs' area of the Farms to choose which school to attend. Although the situation in 1967 may not have required the line to be drawn where it was, it was neither irrational nor arbitrary and capricious for the Board to draw the line along elementary-school attendance borders, rather than city borders, especially when this resulted in there being five elementary schools in each attendance area. Plaintiffs have many good arguments in favor of a different policy: All students in each city should attend the same school; the policy that caused the children in this section of the Farms to attend a different elementary school—traffic safety—is inapplicable to high school students; the disparity in attendance figures is not so great that a few more students attending South makes much difference. But these arguments go to the advisability of the attendance-zone policy, not its rational basis.

Without adducing evidence disputing that the Board drew the high-school boundary line so that the high-school attendance zones corresponded with the elementary-school areas, Plaintiffs allege that GPPSS abandoned the 1967 boundary for thirty years, and since 2000, has required Plaintiffs to apply to have their children enrolled in South. In support, Plaintiffs

attached to their cross-motion for summary judgment six affidavits of long-time Farms residents attesting that GPPSS allowed children in the northwest corner of the Farms to attend South "by simply writing a perfunctory letter requesting the children be allowed to attend [South]." (*E.g.*, Aff. of Patricia Ritter, PID 435.) This does not, however, counter the fact that the Board established the high-school attendance areas along existing elementary-school lines. It suggests, rather, that GPPSS did not strictly enforce the policy because attendance numbers did not require it, and that GPPSS routinely treated the letters as transfer requests and granted them.

To the extent Plaintiffs contend the closing of Barnes Elementary School in 1984 extinguished the Board's 1967 interest underlying the policy, and that GPPSS's continued adherence to the 1967 boundary line is irrational in light of the school's closing, the claim fails. Students who would have attended Barnes were split between two other schools in the North attendance area. After Barnes closed, there were four elementary schools in the North attendance area and five in the South attendance area. It is not evident why Barnes' closing should have resulted in abandonment of the attendance-area policy in favor of redrawing the line to include Plaintiffs in the South area. Further, administrative convenience can serve as a rational basis.[4] *See Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2081 (2012). It is plausible that the Board did not wish to divide the remaining odd number of elementary schools, and conceivable that GPPSS intended to minimize any disruption caused by Barnes's closure by altering only the elementary-school attendance zones affected by the closing. In addition, the

---

[4] Contrary to the dissent's contention, Defendants did not "disclaim[]" at oral argument that administrative convenience provided a basis for the boundary line. *See* Dis. at 2–3. Rather, as the dissent notes, Defendants disclaimed that the number of elementary schools was the basis for the transfer policy amended in 1996, stating that at that time, the district's goal was to balance enrollment. *Id.* at 2 (quoting Oral Arg. at 19:57–20:49). This does not negate that the starting point for applying the new transfer policy was the 1967 boundary line simply because that was the boundary line that had been effect since the time North was created.

Board's continued adherence to the 1967 boundary line leaves undisturbed the expectation that families residing in the former Barnes zone would attend the high school they had previously been assigned by virtue of the 1967 policy.

Plaintiffs further argue, and the dissent asserts, that if GPPSS permits more students to transfer from North to South than the number of students in the disputed area of the Farms, it would negate the proffered rational basis that the reason for excluding the Plaintiffs from the South attendance area is to balance enrollment levels. Dis. at 4–5. But, even assuming that more students are permitted to transfer to South than live in the disputed area, the transfer policy is still clearly addressed to balancing the numbers between the two schools, subject to good reasons for attending the high school in the other attendance area. Plaintiffs' argument rests on a predicate assumption that because Plaintiffs have a special interest in attending the same high school as other students residing in the Farms, they should be the first students permitted to transfer. Or stated differently, that the default position for setting the boundary must be the city boundaries, and GPPSS's rationale of balancing enrollment must be assessed in the context of that default position. However, this ignores that the transfer policy must be applied in the context of a boundary, otherwise no transfers would be necessary, and at the time the policy was put in effect, the existing boundary coincided with the elementary school boundaries. This may appear somewhat tautological, but the 1967 boundaries had a rational basis and unless GPPSS was obliged to redraw the boundary on some basis, it was rational to apply the transfer policy to the existing situation. Because the transfer policy purports to treat all students in the North area equally, and Plaintiffs have not shown that city residence is entitled to more weight than other factors, the fact that more students are permitted to transfer to South than the number of students in the disputed area does not negate the proffered rational basis of enrollment balancing.

Finally, the dissent further asserts that the district court "did not rely on enrollment balance to find the boundary line constitutional—instead, it relied solely on the 1967 decision to tie the boundary to the elementary school zones, which, again, the Defendants now concede was not the rational basis for the boundary line starting in 1995,"[5] Dis. at 4 (internal citation omitted), and therefore "this court should not rely on enrollment balance in the first instance in affirming summary judgment," Dis. at 5, but rather should remand for the requested discovery and for the district court to address the issue. However, although the district court relied on the elementary-school-based attendance areas as the rational basis for the 1967 boundary line, it also addressed enrollment balance in finding constitutional the 1996 transfer policy that resulted in the later enforcement of the boundary line.[6] And, as discussed above, the discovery Plaintiffs seek cannot alter this conclusion.

---

[5] GPPSS's discussion at argument of the 1995 transfer policy appears to refer to the 1996 policy. (*See* Fenton Supp. Aff. ¶ 3, PID 483.) The record does not support that the policy was amended in both 1995 and 1996, and all other references in the record use the 1996 date.

[6] The district court stated:

> The transfer policy is equally constitutional. In fact, Plaintiffs' Amended Complaint, rather ironically, solidifies the rationality of the policy as it alleges that approval of intra-district transfers is dependent upon the "availability of space[]" at the receiving school. (Am. Compl. ¶ 17.) To the extent Plaintiffs suggest that there is no evidence the Board, in creating the attendance zones in 1967, intended to equalize enrollment between the two high schools, this suggestion is irrelevant. The fact of the matter is that the Board subsequently determined that this was necessary to preserve the educational mission of the schools. (*See, e.g.*, Policy 5111 ("Although students will normally attend the school in their own attendance areas, transfers will be granted if class size, staffing, student groupings, or total enrollment in a particular building are not adversely affected.").) There is nothing irrational about enacting a policy for the legitimate purpose of achieving enrollment balance and preserving educational resources.

(PID 598–99.)

We do note, however, that the constitutionality of the transfer policy is at issue only as it resulted in enforcement of the 1967 attendance-area boundary. No other aspect of the policy was before the district court and we limit the district court's declaration of constitutionality to the transfer policy's application to the 1967 boundary line. Further, to the extent the district court's opinion can be understood to address the application of the policy to any particular Plaintiff's transfer request, it goes the beyond the issues presented and should not be so construed. Plaintiffs are free to attempt to challenge, in a different proceeding, other aspects of the transfer policy or GPPSS's application of the transfer policy to particular students.

In sum, because there was a rational basis for the 1967 boundary line and also for the transfer policy, our inquiry must end. *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). "[T]he fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 108 (2003) (internal quotation marks omitted). The district court did not err in granting GPPSS summary judgment on Plaintiffs' equal-protection claim.

### C.

Plaintiffs next maintain the district court erred in rejecting their claim that GPPSS's attendance-area/transfer policy violates their children's associational rights. Plaintiffs state this claim as a violation of the First Amendment. "The Constitution protects two distinct types of association: (1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment." *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004). As Plaintiffs do not allege the attendance-zone policy abridges their children's expressive associational rights, the latter associational right is implicated here.

The "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). Freedom of association, in this respect, "receives protection as a fundamental element of personal liberty." *Id.* at 618. This court recognizes that the types of intimate human relationships that qualify for constitutional protection "'attend the creation and sustenance of a family[,]' including marriage, childbirth, raising and educating children,[7] and cohabitation with relatives, [and] personal friendships and non-marital romantic relationships." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 598 (6th Cir. 2013) (quoting *Roberts*, 468 U.S. at 619; *Johnson v. City of Cincinnati*, 310 F.3d 484, 499 (6th Cir. 2002)). "Only government action that has a 'direct and substantial influence' on intimate association receives heightened review." *Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 942 (6th Cir. 2004) (quoting *Anderson*, 371 F.3d at 882). A "direct and substantial influence" on intimate association occurs "only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations]." *Anderson*, 371 F.3d at 882 (alterations in original) (internal quotation marks omitted). Lesser interferences are subject to rational-basis review. *Id.*

---

[7] The right to associate for the purposes of raising and educating children, *see, e.g.*, *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 844 (1977), is not at issue in this case, as Plaintiffs do not allege the attendance-area policy interferes with their relationships with their children.

Plaintiffs allege that by precluding their children from attending South with other children who reside in the Farms, GPPSS "arbitrarily and unreasonably deprive[s] . . . children [residing in the northwest corner of the] Farms of their right to meet, get acquainted, interact and associate *at school* with their peers and other school children in their community." (Plaintiffs' Br. 51 (Emphasis added.).) Plaintiffs do not allege that the policy prevents their children from forming intimate relationships with children who reside in the Farms. Plaintiffs assert their children "are absolutely precluded *from attending high school* with their peers and contemporaries from their city who only attend high school at []South under the policy." (Plaintiffs' Br. 59 (Emphasis added.).) Their claim does not rest on the ability to form intimate relationships with other school children (enrolled in either high school), but on a desire to have their children form relationships at a particular school—the "school . . . in their community." Framed this way, Plaintiffs assert a constitutionally protected liberty interest in having their children attend school at South. Although the right to personal liberty protects against unwarranted government intrusions into certain private places, such as the home, *see, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 562 (2003), Plaintiffs have not identified any authority or proffered a compelling reason to extend personal liberty to require GPSS to enroll their children in a different public high school. The policy does not prevent Plaintiffs' children from associating with other children from the Farms, and thus, the district court did not err in awarding summary judgment to GPPSS on this claim.

**IV.**

For these reasons, we **AFFIRM**.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I dissent with respect to the majority's holding affirming summary judgment as to the Plaintiffs' equal protection claim and would remand this case to the district court for further proceedings.

The issue is whether the Grosse Pointe Public School System Board of Education's (the "Board") attendance-boundary line that forces the Plaintiffs—who live in Grosse Pointe Farms (the "Farms"), geographically located in the southern part of the school district—to attend Grosse Pointe North High School "bears a rational relation to some legitimate end." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 530 (6th Cir. 2007) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). The original supposed rational basis for the boundary line was the Board's 1967 decision to "establish[] the high-school attendance areas along existing elementary-school lines." Slip Op. at 13. But, the high-school-boundary line has not been tied to the number of elementary schools since 1984—in that year, one of the elementary schools closed, leaving four elementary schools in the north and five in the south. R. 16-1 (Fenton Aff. at 2) (Page ID #269). So the number of elementary schools has not been a rational basis for the high-school boundary for over thirty years.

Despite this, the majority claims that the Board retained the 1967 attendance-boundary line even after the 1984 school closing based on "administrative convenience." Slip Op. at 13. In particular, the majority speculates that it is "plausible" that the Board did not want to divide the remaining odd number of elementary schools after the 1984 school closing; that it is "conceivable" that the Board kept the boundary intact to "minimize any disruption" caused by the school closure; and that continued adherence to the 1967 boundary line allowed parents whose children attended the closed elementary school to send their children to the high school previously assigned by the 1967 policy. *Id*. at 13–14. For these reasons, the majority holds that

the 1967 policy establishing the boundary line based on the number of elementary schools continued to provide a rational basis for the attendance-boundary line even after the 1984 school closure.

Even if these bases were true in 1984, however, the Defendants expressly abandoned any claim that the 1967 policy or the number of elementary schools is a rational basis for the boundary line today. Before the district court, the Defendants argued that the 1967 school-board decision to draw the lines based on the number of elementary schools was the rational basis for the boundary line. But when asked at oral argument in this case how the number of elementary schools could continue to provide a rational basis for the boundary line following the school closure in 1984, the Defendants responded:

> The fact that it closed, I think, in the mid-80s . . . if it had been that way at the time in 1967, it might have done something, it might have done something different. In 1995, when the Board amended its transfer policy to prevent, to preclude transfers once these numbers were hit, the 1,500 or the 300 student gap, *the number of elementary schools was no longer an issue at that point*, it was an enrollment issue, and *it was a balancing of enrollment issue*.

Oral Arg. at 19:57–20:49 (emphasis added). Thus, the Defendants conceded that by 1995 the number of elementary schools was no longer a rational basis for the boundary line. Rather, the Defendants made clear that, starting in 1995, the Board used the 1967 boundary line in conjunction with its transfer policy as a way to balance enrollment.

Thus, the Defendants have disclaimed any argument that "administrative convenience" based on the 1967 policy and the closure of the elementary school in 1984 provides a rational basis for the boundary line. Indeed, we have consistently recognized that parties may abandon a particular position during oral argument. *See, e.g., Shoemaker v. City of Howell*, 795 F.3d 553, 568 (6th Cir. 2015) (because the plaintiff "explicitly disclaimed the notion of trespass during oral argument before this court, . . . [w]e therefore have no need to deal with th[is] issue[].");

*Grumbley v. Burt*, 591 F. App'x 488, 501 (6th Cir. 2015) ("[A]lthough the State originally argued that, under the concurrent sentence doctrine, this Court should not review Grumbley's ineffective assistance of counsel claim, the State abandoned this contention at oral argument."); *United States v. Duval*, 742 F.3d 246, 255 (6th Cir. 2014) ("The [defendants] have waived review of this issue by conceding at oral argument that *Marcinkewciz* controls and forecloses their arguments."); *United States v. McCarty*, 628 F.3d 284, 289 (6th Cir. 2010) ("At oral argument, the government abandoned seeking plain error review, so we examine the reasonableness of McCarty's sentence for abuse of discretion."); *United States v. McMichael*, 377 F. App'x 529, 531 (6th Cir. 2010) ("[Defendant's] counsel expressly disclaimed that remedy at oral argument. We therefore will not review the argument."). And, although courts may hypothesize plausible justifications for a policy that were not raised by a party, *Am. Exp. Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011), we should not breathe new life into an argument that was expressly disclaimed at oral argument. In other words, even though we may speculate as to possible motivations for a policy, we may not uphold a policy based on a justification that the state expressly admits *was not the basis* for that policy.

Consequently, we are left with Defendants' claim that, beginning in 1995 and continuing to today, the rational basis for the boundary line is to balance enrollment between the north and south high schools. Enrollment balance—along with the collateral effects of the balance (*e.g.*, class size, class offerings, staffing, resource preservation, etc.)—is a rational basis for the attendance-boundary line. But this is where the Plaintiffs' request for discovery regarding transfer statistics becomes important. The Plaintiffs argued to the district court that, to resolve a disputed issue of fact regarding whether the basis for the boundary line is to balance enrollment, the Plaintiffs needed discovery detailing the number of students permitted to transfer from the

northern area to the south high school per year. "[The Plaintiffs] needed that number to make a point that the reason for excluding the Plaintiffs from the South High School is not to balance the enrollment levels at the two high schools because if that is the case, they would not be granting dozens of transfers to students that otherwise would be attending the North High School." R. 33 (Mot. Hr'g at 5–6) (Page ID 623–24). In its opinion granting summary judgment, the district court noted that the Defendants, "[s]omewhat curiously," did not include the transfer statistics in its filings. R. 29 (D. Ct. Op. at 8 n.8) (Page ID #585). Then, in granting summary judgment, the district court did not rely on enrollment balance to find the boundary line constitutional—instead, it relied solely on the 1967 decision to tie the boundary to the elementary school zones, *id.* at 20–21 (597–98), which, again, the Defendants now concede was not the rational basis for the boundary line starting in 1995.

Thus, the district court did not rule on whether enrollment balance is a rational basis for the attendance-boundary line. For good reason—the Plaintiffs requested, but (because the case was in its infancy) did not have an opportunity to receive, discovery that could negate that rational basis. For example, if the school district granted transfers from the north high school to the south in great numbers and with little showing of need, enrollment balance may not rationally explain the school district's continued decision to carve the northwest corner of the Farms out of the south attendance area. And because the district court did not rely on enrollment balance as a basis for finding the attendance areas constitutional, the fact that the Plaintiffs consented to treating the Defendants' motion as one for summary judgment is immaterial. In addition, because the Plaintiffs did not have any opportunity to receive discovery as to this issue, this court should not rely on enrollment balance in the first instance in affirming summary judgment. Instead, the district court should resolve this issue initially, after the Plaintiffs are given the

opportunity to seek discovery that could negate the Defendants' purported rational basis for the policy.

For these reasons, I would **VACATE** the district court's grant of summary judgment as to the equal protection claim and **REMAND** the case to the district court for discovery as to this claim. I respectfully dissent.